80 S.W.3d 232 (2002)
In the Interest of J.M.M., B.R.M., and W.T.M., Children.
No. 2-01-100-CV.
Court of Appeals of Texas, Fort Worth.
June 13, 2002.
*235 Stephen R. Bjordammen, Wichita Falls, for Appellant.
John Cornyn, Atty. Gen. of Texas; Howard G. Baldwin, Jr., First Ass't Atty. Gen.; Julie Caruthers Parsley, Solicitor Gen.; Melinda H. Sims, Ass't Solicitor Gen., Austin, for Appellee.
PANEL B: HOLMAN, GARDNER, and WALKER, JJ.

*236 OPINION
ANNE GARDNER, Justice.

I. INTRODUCTION
This is an appeal from a judgment rendered on a jury verdict, terminating parental rights. The judgment terminated the parental rights of Appellant Marium M. and her husband James M. as to three of their children, J.M.M., B.R.M., and W.T.M. Marium was the only parent to appear at trial and is the only parent appealing. In ten issues, Marium complains of the submission of two jury instructions regarding alternative means of endangerment of her children, no evidence to support termination on any of four grounds submitted, legal and factual insufficiency of the evidence of each ground to support the verdict, lack of an instruction submitting an affirmative defense, and the constitutionality of the broad-form jury questions inquiring as to termination with respect to each child with instructions constituting a disjunctive submission of all grounds asserted. We will affirm.

II. FACTUAL BACKGROUND
Marium and James M. are the natural parents of J.M.M., four years old, B.R.M., three years old, and W.T.M., twenty-two months old at the time of trial. Marium and James are also the natural parents of two other children, J. and C.; however, their parental rights were terminated as to those children on June 19, 1997, on grounds of endangerment and abandonment.
In May of 1991, the parents' first child, J., was born in Dallas, Texas. Due to J.'s premature birth, the Texas Department of Protective and Regulatory Services (TDPRS) investigated the parents and took J. into protective custody. After six months, TDPRS returned J. to the parents' custody.
After J. was returned to the parents, they began to travel through various states. The parents moved first to West Virginia, then to Arkansas. In 1992, while they were in Arkansas, C. was born. After C.'s birth, the parents moved to Daytona Beach, Florida. While in Florida, Marium decided to leave James. Marium took the children and moved to her mother's home in Arkansas.
On February 10, 1993, shortly after Marium moved to Arkansas, James pleaded guilty to lewd and lascivious conduct, assault on a child. He was sentenced to four and one-half years' imprisonment. Some time in 1993, Marium and the children moved back to West Virginia. When James was released from prison in 1995, Marium reunited with him, giving him full access to the children, and they moved to Lebanon, Missouri.
While living in Missouri, the parents became friends with Clarence and Reina Krusen. After six or seven months, the parents left their children, J. and C., with the Krusens and moved to Houston, Texas. The parents executed a signed statement giving the Krusens temporary custody of the children "until further notice." After the parents arrived in Houston, Marium wrote two letters to the Krusens; both letters were returned. The parents contacted the Houston police and were told the Krusens had moved to an undisclosed address. In an effort to find their children, the parents joined a traveling carnival. By this time, Marium was pregnant with J.M.M.
While the carnival was in Arizona, in April of 1996, J.M.M. was born four-weeks premature and underweight. J.M.M.'s premature birth prompted the Arizona Department of Protective Services to initiate an investigation of the parents. The Arizona officials notified the parents that Texas *237 authorities were looking for them in connection with the abandonment of J. and C. Marium asked the Arizona authorities to contact whoever had J. and C. and ask them to get in touch with her. The Arizona authorities concluded their investigation, allowing J.M.M. to leave the hospital with the parents.
After J.M.M. was released from the hospital, the parents moved to Knoxville, Tennessee to start a computer business, which failed after a couple of months. The parents moved on, this time to Pigeon Forge, Tennessee. On March 30, 1997, B.R.M. was born in nearby Severville, Tennessee. Following the birth of B.R.M., the parents moved to Daytona, Florida. Six months after moving to Florida, the parents moved again, to Dothan, Alabama. James joined a traveling carnival and left while the family stayed in Dothan. A couple of months later, he returned, and the family started selling T-shirts out of a bus.
When James returned, the family left Alabama for Indiana with their T-shirt business, moving from campsite to campsite and living in the bus with J.M.M. and B.R.M. for approximately one year. They were headed back to Louisiana when two of their tires blew out, stranding the family in Bowie, Texas. In Bowie, the parents lived in a house they agreed to renovate in exchange for rent. On March 9, 1999, W.T.M. was born in Bowie, Texas. After a dispute with their landlord, the parents moved to Faith Mission, a shelter in Wichita Falls, Texas.
On March 12, 1999, the TDPRS received a referral that the parents' children were dirty and neglected. In response to the referral, Debbie Adams, a Child Protective Services (CPS) investigator, visited Faith Mission and found the children were dirty, wearing wet clothing, and verbally undeveloped. A resident at the shelter described the children as running rampant through the shelter, and even in the street. According to that witness, Marium was seen ignoring her children and, when not ignoring them, she was seen yelling or screaming, and slapping or spanking them, telling them it was their fault she was at the Mission. Adams observed that the children showed no attachment to Marium, did not have a doctor, their immunizations were not current, and J.M.M. had a cold.
Adams returned seven days later to find that J.M.M. still had a cold. Adams took Marium and the children to a doctor, who found the children were malnourished and developmentally delayed. To address the children's developmental delay, he referred them to North Texas Rehabilitation Services.
On March 20, 1999, the TDPRS received a second referral alleging James and Marium had physically abused both J.M.M. and B.R.M. Adams again visited the family and found that J.M.M. was limping, had numerous bruises on his face, scratches under his right eye, and three bruises on his upper back. Marium claimed J.M.M. "bruises real easy" and was limping because he might have caught his leg in the bed the night before.
The children were immediately taken to a hospital where an examination of J.M.M. revealed that he had suffered from possible child abuse. James admitted to CPS caseworker, Lorraine Hail, that he struck then three-year-old J.M.M. in the face because he was "sassy" with his mother and would not go to bed. Hail created a safety plan, which both Marium and James signed. The safety plan prohibited James from being alone with any of the children.
Shortly after the parents returned from the hospital, James fled to Dallas, Texas with the stated intent to get a job, save money, and turn himself in for child abuse. On March 23, 1999, an arrest warrant for *238 James was issued. James was apprehended in Dallas and transported back to Wichita Falls, where he pleaded guilty and was sentenced to 180 days in jail for injury to a child. Despite James's guilty plea, Marium refused to believe James had injured their children. Pursuant to a plea agreement, James was credited with time served and was released from jail on the day of his guilty plea. On the day of his release, Marium and the children reunited with James and left Faith Mission to stay in a local motel.
Nine days later, TDPRS received a third referral alleging that the parents had arrived at a nearby church, and that they were dirty, hungry, homeless, and were begging for money to repair their car. When Adams arrived at the church she noticed J.M.M. had scratches under his right eye and bruises on his back. James's explanation was that J.M.M. was a "clumsy" child.

III. PROCEDURAL BACKGROUND
After considering a long list of factors, Adams decided the children should be removed and placed into temporary foster care.[1] On August 10, 1999, the TDPRS filed its original petition seeking emergency protection of the children. The parents agreed to temporary separation from their children. On September 14, 1999, the court appointed TDPRS as temporary managing conservator of the children. A service plan was developed and a court order was issued establishing the actions necessary for the parents to regain custody of their children.
At the time the order was issued, TDPRS's goal was family reunification. However, Marium missed counseling appointments, refused to pay child support, changed residences four or five times despite a requirement that she maintain stable housing, and failed to maintain stable employment. James worked in roofing, construction, and as a male stripper. During visitations with the children, he exhibited manic behavior and would leave early.
In January of 2000, the TDPRS changed its goal from reunification to termination after it concluded that Marium and James were in violation of the court's order and support plan. In April of 2000, James purportedly left Wichita Falls, although there were reports that he was seen in the area after that date. In October of 2000, James was arrested in Dallas for prostitution. He was found guilty and incarcerated.
On May 19, 2000, the TDPRS amended its pleadings to seek termination of the parents' parental rights as to the three children. On January 10, 2001, trial of this case began before a jury. The jury rendered its verdict of "yes," on January 16, 2001, in response to broad-form questions as to each parent, inquiring whether their parental rights should be terminated as to all three children. The trial court rendered a decree of termination based upon the jury's verdict.

IV. BURDEN OF PROOF IN TERMINATION PROCEEDINGS
A parent's rights to "the companionship, care, custody, and management" of their children are constitutional interests "far more precious than any property right." Santosky v. Kramer, 455 U.S. 745, 758-59, 102 S.Ct. 1388, 1397, 71 L.Ed.2d *239 599 (1982); accord Holick v. Smith, 685 S.W.2d 18, 20 (Tex.1985). The United States Supreme Court, in discussing the constitutional stature of parental rights, said, "the interest of parents in the care, custody, and control of their childrenis perhaps the oldest of the fundamental liberty interests recognized by this Court." Troxel v. Granville, 530 U.S. 57, 65, 120 S.Ct. 2054, 2060, 147 L.Ed.2d 49 (2000).
In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one or more of the acts or omissions enumerated under subdivision (1) of the statute and, must also prove that termination is in the best interest of the child. TEX. FAM.CODE ANN. § 161.001 (Vernon Supp.2002). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. Tex. Dep't of Human Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex.1987). Because of the elevated status of parental rights, the quantum of proof required in a termination proceeding is elevated from the preponderance of the evidence to clear and convincing evidence. Santosky, 455 U.S. at 747, 102 S.Ct. at 1391.
Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegation sought to be established." Leal v. Tex. Dep't of Protective & Regulatory Servs., 25 S.W.3d 315, 319 (Tex.App.Austin 2000, no pet.). This intermediate standard falls between the preponderance standard of ordinary civil proceedings and the reasonable doubt standard of criminal proceedings. State v. Addington, 588 S.W.2d 569, 570 (Tex. 1979); In re D.T., 34 S.W.3d 625, 630 (Tex.App.Fort Worth 2000, pet. denied) (op. on reh'g). While the proof must be more than merely the greater weight of the credible evidence, there is no requirement that the evidence be unequivocal or undisputed. Addington, 588 S.W.2d at 570. Termination proceedings should be strictly scrutinized, and involuntary termination statutes are strictly construed in favor of the parent. Holick, 685 S.W.2d at 20-21; In re A.V., 849 S.W.2d 393, 400 (Tex.App.Fort Worth 1993, no writ).

V. LEGAL AND FACTUAL SUFFICIENCY
Marium's first, second, third, and fifth issues complain of error in submitting instructions to the jury accompanying the broad-form question inquiring as to termination, over her objections of no evidence to support submission of those instructions. In her fourth, sixth, ninth, and tenth issues, she complains that the evidence was legally and factually insufficient to support the jury's verdict regarding all four grounds of termination submitted by the jury instructions.
A. STANDARD OF REVIEW
When presented with legal sufficiency ("no evidence") and "factual sufficiency" challenges, the reviewing court first examines the no evidence complaints. In reviewing a complaint of no evidence to support submission of a question or instruction to a jury, the reviewing court looks only at the evidence that tends to support the verdict. Long Island Owner's Ass'n, Inc., v. Davidson, 965 S.W.2d 674, 680 (Tex.App.-Corpus Christi 1998, pet. denied). Regardless of the manner in which the complaint is preserved, in determining a "no-evidence" point, we consider the evidence and inferences in the light most favorable to the party in whose favor the judgment has been rendered, and indulge every reasonable inference from the evidence in that party's favor. Formosa *240 Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc., 960 S.W.2d 41, 48 (Tex.1998) (op. on reh'g); Merrell Dow Pharms., Inc. v. Havner, 953 S.W.2d 706, 711 (Tex.1997), cert. denied, 523 U.S. 1119, 118 S.Ct. 1799, 140 L.Ed.2d 939 (1998); In re King's Estate, 150 Tex. 662, 244 S.W.2d 660, 661 (1951).
A no evidence point will only be sustained when (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla of evidence, or (d) the evidence conclusively establishes the opposite of a vital fact. Uniroyal Goodrich Tire Co. v. Martinez, 977 S.W.2d 328, 334 (Tex.1998), cert. denied, 526 U.S. 1040, 119 S.Ct. 1336, 143 L.Ed.2d 500 (1999) (citing Robert W. Calvert, "No Evidence" and "Insufficient Evidence" Points of Error, 38 Tex.L.Rev. 361, 362-63 (1960)). If there is more than a scintilla of evidence to support the judgment, the evidence is legally sufficient. Cont'l Coffee Prods. Co. v. Cazarez, 937 S.W.2d 444, 450 (Tex.1996). There is more than a scintilla of evidence when the proof supplies a reasonable basis on which reasonable minds may reach different conclusions about the existence of a vital fact. Orozco v. Sander, 824 S.W.2d 555, 556 (Tex.1992).
An assertion that the evidence is factually insufficient to support a finding means that the evidence supporting the finding is so weak or the evidence to the contrary is so overwhelming that the answer should be set aside and a new trial ordered. Garza v. Alviar, 395 S.W.2d 821, 823 (Tex.1965). In determining a factual sufficiency point, we have previously concluded that the higher burden of proof in termination cases does not alter the appellate standard of review for factual sufficiency of the evidence. See In re D.M., 58 S.W.3d 801, 808 (Tex.App.Fort Worth 2001, no pet.); D.T., 34 S.W.3d at 630; see also Faram v. Gervitz-Faram, 895 S.W.2d 839, 843 (Tex.App.Fort Worth 1995, no writ) (rejecting "intermediate standard of appellate review" for cases involving "clear and convincing" burden of proof). Rather, the higher burden of proof merely changes the weight of the evidence necessary to support a finding or verdict. D.T., 34 S.W.3d at 632. When reviewing a finding made by clear and convincing evidence, we determine whether the evidence is sufficient to make the existence of the fact highly probable, not whether the evidence supporting the finding is sufficient to make the existence of the fact more probable than not, as in ordinary civil cases.
In considering whether evidence rises to the level of being clear and convincing, we must consider whether the evidence is sufficient to produce in the mind of the fact finder a firm belief or conviction as to the truth of the allegation sought to be established. Id. We will sustain a factual insufficiency point only if the evidence is so weak or the evidence to the contrary is so overwhelming that the fact finder could not have reasonably concluded there was a high probability that the endangering conduct or conditions occurred or that termination was in the children's best interest. Id. We are required to consider all of the evidence in the case in making this determination. Id. at 630.
B. NO EVIDENCE TO SUPPORT "PLACEMENT"; LEGAL AND FACTUAL SUFFICIENCY UNDER § 161.001(1)(D) AND (E)
Marium's first and second issues complain of alleged infirmities in the jury instructions submitting the two grounds for termination under sections *241 161.001(1)(D) and (E) of the family code.
The instructions read as follows:
For the parental rights of Marium M. to be terminated, it must be proven by clear and convincing evidence that at least one of the following events occurred:
(1) the parent has knowingly placed or knowingly allowed the child[ren] to remain in conditions or surroundings which endanger the physical or emotional well-being of the child[ren]; or
(2) the parent has engaged in conduct or knowingly placed the child[ren] with persons who engaged in conduct which endangers the physical or emotional well-being of the child[ren].
(emphasis supplied).
Marium argues that the trial court erred by submitting these instructions because there is no evidence that she "placed" the children anywhere with anyone. Further, she contends, the trial court submitted the prohibited conduct in the disjunctive, requiring that the parent must either have (1) personally engaged in acts or omissions that endangered the children or (2) placed the children in conditions or with persons who engaged in such acts or omissions in order to have their rights terminated on these grounds. Because of the disjunctive submission, Marium insists it cannot be determined whether the jury impermissibly based its verdict on one or both of the grounds that are devoid of evidence to support them, and thus, the submission error is harmful.
Likewise, Marium's ninth and tenth issues assert that the evidence was legally and factually insufficient to support the jury's verdict that she had knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered the children's physical or emotional well-being, Tex. Fam.Code Ann. § 161.001(1)(D) (Vernon 2002), or that she engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered the children's physical or emotional well-being. Id. § 161.001(1)(E).
For purposes of sections 161.001(1)(D) and (E),
"[E]ndanger" means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, [but] it is not necessary that the conduct be directed at the child or that the child actually suffers injury. Rather, "endanger" means to expose to loss or injury; to jeopardize.
Boyd, 727 S.W.2d at 533. Section (D) permits termination based upon a single act or omission, while section (E) requires a "course of conduct." In re M.J.M.L., 31 S.W.3d 347, 351 (Tex.App.-San Antonio 2000, pet. denied).
Testimony from TDPRS workers, the court appointed special child advocate, a clinical psychologist, and a resident at the homeless shelter where the family lived at one point, reveals that James was physically abusive to the children and that Marium was unable or unwilling to protect the children from him. TDPRS worker Adams testified that, despite witnessing James's plea of guilty for injury of a child, Marium took James back to live with the children, left the mission where they were staying, moved into a hotel, and was homeless shortly thereafter. Likewise, when Marium was questioned by TDPRS workers about the threat James posed to the children, she replied that, despite James's admission that he injured J.M.M., she did not believe that James actually did anything to harm any of the children.
Marium has since acknowledged that James was a threat to her children. James left the family in April of 2000. Marium contended at trial that as long as *242 James is gone, he is not a danger to the children. At trial, Marium testified that if James did come back, she would not reunite with him. Despite Marium's testimony, Dr. Richard Eckert, a clinical psychologist, testified that Marium could not act independently of her husband, James. The court-appointed special advocate, Linda Clark, testified that she had seen James on two occasions since the date he left, and believed that there was a strong chance he was in the area. This evidence demonstrates that Marium has placed her children with a dangerous person, i.e. James, and will likely do so in the future.
Aside from the fact that Marium has placed her children with a person who would endanger their physical or mental well-being, the evidence also demonstrates that Marium has placed them in conditions that endanger their physical or mental well-being. As discussed above, Marium has a long history of engaging in a transient lifestyle. The record provides that Marium and James moved frequently with J. and C., and they have moved with J.M.M., B.R.M. and W.T.M. across a large number of states. A doctor and a clinical psychologist both concluded that it was the transient lifestyle that had hampered the children's development to date. Evidence also reveals that, despite spending eleven months in her last residence, Marium has expressed an interest in moving to Florida in an effort to create a better life.
Placement with an abusive parent or relative is endangerment under either provision of the statute. See In re J.M.C.A., 31 S.W.3d 692, 698 (Tex.App.-Houston [1st Dist.] 2000, no pet.) (terminating parental rights of mother who allowed children to remain with abusive father); In re W.S., 899 S.W.2d 772, 778 (Tex.App.-Fort Worth 1995, no writ) (holding evidence mother allowed children contact with sexually abusive father and failed to enforce safety plans legally and factually sufficient to support statutory placement requirement). Contrary to Marium's premise that there is no evidence she placed the children anywhere with anyone, we hold there is legally and factually sufficient evidence satisfying the clear and convincing standard that Marium knowingly placed the children or allowed them to remain in conditions or surroundings that endangered their physical or emotional well-being in violation of family code section 161.001(1)(D), and that she knowingly engaged in conduct or knowingly placed her children with persons who engaged in conduct endangering their physical or emotional well-being in violation of family code section 161.001(1)(E). Likewise, because there was evidence to support the submission, we hold that there was no error in submission of the instructions regarding placement of the children. Having found no error, it is unnecessary for us to consider whether disjunctive submission was harmful. We overrule Marium's first, second, ninth, and tenth issues.
C. NO EVIDENCE TO SUPPORT SUBMISSION AND LEGAL AND FACTUAL SUFFICIENCY OF FINDING UNDER § 161.001(1)(M) (PREVIOUS TERMINATION OF RIGHTS)
Marium argues in her third issue that the trial court erred in submitting an instruction allowing the jury to find that she had previously had her parental rights terminated as to another child. By her fourth issue, she claims that the evidence is legally and factually insufficient to support the jury's verdict that her rights should be terminated on that ground. Marium concedes that, in Jefferson County, Texas, her parental rights were terminated in 1997 as to J. and C. However, Marium contends that the State failed to offer any proof during this trial that the prior termination was based upon a finding *243 that she had violated any particular section of Chapter 161 of the Texas Family Code, much less sections 161.001(D) or (E).
The trial court may order the involuntary termination of the parent-child relationship if the court finds clear and convincing evidence that it is in the best interest of the child and a parent has had her "parent-child relationship terminated with respect to another child based on a finding that the parent's conduct was in violation of Paragraph (D) or (E) [of Section 161.001(1)] or substantially equivalent provisions of the law of another state." Tex. Fam.Code Ann. § 161.001(1)(M) (Vernon 2002). The June 19, 1997 Amended Decree of Termination from Jefferson County, a certified copy of which was offered into evidence by the TDPRS, states:
The court finds by clear and convincing evidence that Marium [M.] and James [M.] have knowingly placed and knowingly allowed the child[ren] to remain in conditions and surroundings which endanger the physical and emotional well-being of the subject child[ren], and have engaged in conduct and knowingly placed the child[ren] with persons who engaged in conduct which endangers the physical and emotional well-being of the child[ren].
The Amended Decree of Termination tracks the language of sections 161.001(1)(D) and (E) and was admitted without objection at trial. Marium argues, however, that the State had to present proof, beyond the Decree of Termination, that her parental rights were terminated as to her other children based upon grounds (D) or (E). In essence, Marium contends that the TDPRS must again present the proof utilized in the earlier trial to support the prior court's decree of termination for use in this trial. Notably, Marium cites no case law supporting her contention.
We hold that, when a prior decree of termination as to another child is properly admitted into evidence, the TDPRS need not reestablish that the parent's conduct with respect to that child was in violation of sections 161.001(1)(D) or (E). The TDPRS need only show that the Appellant's rights were terminated as to her other children based on findings that she violated sections (D) and (E). Tex. Fam. Code Ann. § 161.001(1)(M); see also id. § 161.211(a) (precluding direct or collateral attack on order terminating parental rights on person personally served more than six months after date order was signed) (added effective September 1, 1997).
As a matter of law, Marium's parental rights to her two older children, J. and C., were terminated based on findings in the termination decree that she violated sections 161.001(1)(D) and (E). Therefore, we hold the evidence is legally and factually sufficient to support termination based on section 161.001(M) of the family code. Having found evidence in support of a prior termination of Marium's parental rights, we also hold that the trial court did not err in submitting this instruction to the jury. We overrule Marium's third and fourth issues.
D. NO EVIDENCE TO SUPPORT SUBMISSION AND LEGAL AND FACTUAL SUFFICIENCY OF EVIDENCE UNDER § 161.001(1)(O) (FAILURE TO COMPLY WITH COURT ORDER)
In Marium's fifth issue, she claims the trial court erred in instructing the jury to consider termination for failure to comply with the provisions of a court order necessary to obtain the return of her children. Tex. Fam.Code. Ann. § 161.001(1)(O) (Vernon 2002). In her sixth issue, she similarly urges that the evidence was legally *244 insufficient, as well as factually insufficient, to support the jury's finding of termination based on her failure to comply with the provisions of that court order. Marium argues the evidence shows she substantially complied with the trial court's "Temporary Orders in Suit Affecting Parent-Child Relationship." More specifically, she asserts that the State's focus on home, employment, counseling, and child support did not present legally or factually sufficient evidence that she did not comply with the court's order.
The court order provided that Marium must "obtain and maintain a clean, safe, and stable home environment" as one of the conditions necessary to obtain the return of her children. Dr. David Sabine, a clinical psychologist, testified at trial that Marium's transient lifestyle was largely responsible for the poor development and emotional difficulties of her children, and would harm them further if continued. Uncontested testimony from Harlene Coffer, a parent worker with TDPRS, indicates that Marium moved no fewer than four or five times after the date of the temporary order. In her brief, Marium concedes that she "resided at three different residences and spent two short stays in a motel." Despite her continued history of transience, the record also reflects that Marium has stayed at her last residence for eleven months. However, Linda Clark, a court appointed special advocate, testified that Marium told her that once the children were returned to her she would take them to Florida to find better options.
The record provides evidence that Marium led a transient lifestyle, her transient lifestyle was harmful to her children, and Marium will likely continue a transient lifestyle. Moreover, there is ample evidence that Marium did not provide a safe home environment as required by the court order, as shown by the evidence of her history of neglectful behavior in failing to supervise the children, verbal and emotional abuse, medical evidence of neglect, and her behavior in allowing James, a convicted child abuser, to remain in the home with the children. There is also evidence that Marium will likely reunite with James or someone like him. Finally, contrary to the temporary orders of the court, the evidence reveals Marium refused counseling and failed to pay child support as ordered.
Based on a careful review of the record, we hold that there is legally and factually sufficient evidence that Marium violated the court's temporary orders. While Marium asserts that she substantially complied with the orders, we disagree that the evidence supports any such level of compliance. In support of her contention, Marium cites Doty-Jabbaar v. Dallas County Child Protective Services, 19 S.W.3d 870 (Tex.App.-Dallas 2000, pet. denied) for the proposition that "substantial compliance" with court orders suffices to preclude termination under section 161.001(1)(O). Doty-Jabbaar is distinguishable; it construed the Indian Child Welfare Act, 25 U.S.C. §§ 1901-1963, a federal statute regulating relations of Native American parents and children, imposing a higher burden of proof for separate and distinct grounds for termination from those found in the family code. 19 S.W.3d at 874-75. Because there is evidence supporting a section 161.001(1)(O) instruction, and because there is legally and clearly and convincingly factually sufficient evidence that Marium violated a relevant court order, we overrule her fifth and sixth issues.

VI. JURY CHARGE ERROR AND DUE PROCESS
In Marium's eighth issue, she argues that the broad-form jury charge *245 question asking only whether her parental rights should be terminated, with no specific jury question as to any of the four grounds alleged for termination, violated her due process rights under both the United States and Texas Constitutions. The judge submitted a single question for each child at trial as a broad-form submission. The questions read as follows:
Question No. 1
Should the parent-child relationship between Marium M. and the child, J.M.M., be terminated?
Answer: "Yes" or "No"
Answer: ___
Question No. 2
Should the parent-child relationship between Marium M. and the child, B.R.M., be terminated?
Answer: "Yes" or "No"
Answer: ___
Question No. 3
Should the parent-child relationship between Marium M. and the child, W.T.M., be terminated?
Answer: "Yes" or "No"
Answer: ___
In connection with these broad-form questions, instructions submitted with the charge set forth, in the disjunctive, the grounds asserted by the TDPRS as set forth in sections 161.001(1)(D), (E), (M), and (O). The jury was instructed that at least one of the grounds, referred to as "events," must be proven by clear and convincing evidence in order to terminate, as follows:
For the parental rights of Marium M. to be terminated, it must be proven by clear and convincing evidence that at least one of the following events has occurred:
(1) the parent has knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endanger the physical or emotional well-being of the children; or
(2) the parent has engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangers the physical or emotional well-being of the children; or
(3) the parent has had her parent-child relationship terminated with respect to another child ... based on a finding that the parent's conduct was in violation of Section 161.001(1)(D) or (E), Tex. Fam.Code, or substantially equivalent provisions of the law of another state; or
(4) the parent has failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the children who have been in the permanent or temporary managing conservatorship of the Department of Protective and Regulatory Services for not less than nine months as a result of the children's removal from the parent under Chapter 262 for the abuse or neglect of the children.
Instructions were also submitted explicitly providing a description of the rights, privileges, duties, and powers of a parent along with definitions of the terms "termination," "clear and convincing evidence," and "endanger." The instructions included a specific requirement that the jury must render its verdict upon the vote of ten or more members of the jury, and "[t]he same ten or more of you must agree upon all of the answers made and to the entire verdict."[2]See Tex.R. Civ. P. 292.
*246 Marium objected in the trial court and brings forward her complaint on appeal that the broad-form submission of the question of termination allowed the jury to return a verdict unfavorable to her without the same ten jurors finding that the State sustained its burden as to any or all of the statutory grounds for termination asserted, in violation of Texas Rule of Civil Procedure 292. See Tex.R. Civ. P. 292 (providing, "[a] verdict may be rendered in any cause by the concurrence, as to each and all of the answers made, of the same ten members of an original jury of twelve"). Marium points out that, in this case, four distinct and separate grounds for termination were pleaded, submitted and argued to the jury, and it is impossible from the jury's answer to the broad-form submission to know which, if any, of the grounds ten or more of the members of the jury found established by clear and convincing evidence.
A. RULE 277 AND Texas Department of Human Services v. E.B.
Texas Rule of Civil Procedure 277 applies to parental rights cases "the same as in other civil cases." Tex. Dep't of Human Servs. v. E.B., 802 S.W.2d 647, 649 (Tex.1990). In E.B., the supreme court said that Rule 277 means exactly what it says. Id. "Unless extraordinary circumstances exist, a court must submit such broad-form questions." Id. Rule 277 provides, "In all jury cases the court shall, whenever feasible, submit the cause upon broad-form questions. The court shall submit such instructions and definitions as shall be proper to enable the jury to render a verdict." Tex.R. Civ. P. 277.
In E.B., the supreme court specifically rejected a complaint identical to Marium's. 802 S.W.2d at 649. E.B. was a parental rights termination case in which that court expressly approved a virtually identical broad-form question as submitted in this case, asking whether the parent's rights should be terminated, with accompanying instructions to the jury to base its answer on one or both statutory grounds listed in sections 161.001(1)(D) and (E). Id. The appellant in E.B. argued that use of the broad-form jury charge violated her due process rights under both the Texas and United States Constitutions for the same reason submitted by Marium here, i.e., that it was impossible to tell from the single affirmative answer to the broad-form termination question whether the same ten jurors agreed as to one or both of the statutory termination grounds submitted by instruction. Id.
The Supreme Court of Texas approved the broad-form submission. Id. The E.B. court observed that Rule 277 mandates broad-form submissions "wherever feasible" and eliminates the trial court's discretion to submit separate questions as to each element of a case. Id. Specifically, the supreme court approved the form of the submission of multiple grounds for termination in E.B., holding the "controlling question in this case was whether the parent-child relationship ... should be terminated, not what specific ground or grounds... the jury relied on to answer affirmatively the question posed." Id. In so holding, the supreme court approved the instruction submitting the independent grounds in the alternative, noting that all ten jurors agreed that the mother had endangered the children under one or the other ground submitted, and rejecting the argument the broad-form charge violated *247 parents' due process rights in termination cases. Id. at 649.
B. Crown Life AND THE PRESUMED HARM RULE
Marium suggests that E.B. is wrong, and that it was recently modified by the supreme court in Crown Life Insurance Co. v. Casteel, 22 S.W.3d 378, 387-90 (Tex. 2000). We are, of course, bound to follow E.B. unless it is no longer the law.[3] In Crown Life, the mandate of Rule 277 for broad-form submission was addressed in the context of a jury verdict in favor of an insurance agent against an insurer for article 21.21 insurance code violations, including violations of Deceptive Trade Practices Act (DTPA) provisions incorporated into the insurance code. Id. at 388. The jury found in favor of the agent in response to a single broad-form question regarding Crown Life's liability, with thirteen independent theories of liability submitted disjunctively to the jury by instruction. Id. at 387.
The supreme court agreed with the court of appeals' holding in Crown Life that four of the theories submitted were invalid because the agent was not a consumer and, therefore, lacked standing to sue under the DTPA. Id. at 388. However, the supreme court disagreed with the court of appeals that submission of the invalid theories was harmless under the harm analysis incorporated in former Texas Rule of Appellate Procedure 81(b)(1),[4] or under previous cases holding that submission of an invalid theory in a single broad-form question is harmless if any evidence supports a finding of liability on a valid theory. Id.
Holding that the error in combining submission of invalid theories with valid theories over proper objection was harmful, the supreme court noted:
[W]hen a jury bases a finding of liability on a single broad-form question that commingles invalid theories of liability with valid theories, the appellate court is often unable to determine the effect of this error. The best a court can do is determine that some evidence could have supported the jury's conclusion on a legally valid theory. To hold this error harmless would allow a defendant to be held liable without a judicial determination that a factfinder actually found that the defendant should be held liable on proper, legal grounds.
Id. at 388. Consequently, the court held that when a single broad-form liability question erroneously commingles valid and invalid theories and the appellant's objection is timely and specific, the error is harmful and a new trial is required "when the appellate court cannot determine whether the jury based its verdict on an improperly submitted invalid theory." Id. The court cited the alternative basis for harmful error under current Texas Rule of Appellate Procedure 61.1(b). See Tex. R.App. P. 61.1(b) (stating, "No judgment may be reversed on appeal ... unless the [s]upreme [c]ourt concludes that the error complained of ... probably prevented the petitioner from properly presenting the case to the appellate courts."); see also Tex.R.App. P. 44.1(a)(2).[5] The Crown Life *248 court expressly overruled the line of cases holding that error is harmless if any evidence supports a properly submitted liability theory. 22 S.W.3d at 388.
As to the agent's argument that Rule 277 requires that all liability theories be submitted in a single broad-form question, the supreme court in Crown Life pointed out that the rule only mandates broad-form submission "where feasible," and also requires the court to "submit such instructions and definitions as shall be proper to enable the jury to render a verdict." Id. at 390 (quoting Tex.R. Civ. P. 277). Thus, the court pointed out, it is implicit in the rule that the jury be able to base its verdict on legally valid questions and instructions. Id. Therefore, it may not always be feasible to submit a single question that incorporates separate theories of liability. Id.
In the case at bar, unlike Crown Life, we do not have commingled valid and invalid theories. However, Marium argues that the presumed harm analysis of Crown Life should apply because we have theories that were erroneously submitted because they were supported by no evidence. The supreme court has not yet addressed whether Crown Life applies where a theory should not have been submitted because it is not raised by the evidence. See City of Fort Worth v. Zimlich, 29 S.W.3d 62, 69 n. 1 (Tex.2000) (noting question whether Crown Life should be extended to cases where no evidence supports one or more theories of liability within a broad-form submission was not before the court in that case).
The intermediate appellate courts appear divided as to whether Crown Life should extend to errors in submission based on no evidence.[6] It is unnecessary for us to enter the fray in this case because, as we have previously held, there was no error in submitting any of the four grounds for termination in this case because each ground was supported by legally sufficient evidence.
C. IMPACT OF Crown Life ON E.B.
Independently of her complaint as to lack of evidence and presumed harm, Marium also argues that the disjunctive submission was a violation of her due process rights. For this proposition, Marium relies on In re B.L.D., 56 S.W.3d 203 (Tex. App.-Waco 2001, no pet.). B.L.D. involved a parental rights termination case in which appellant argued broad-form questions and instructions, virtually identical to those approved in E.B., did not strictly comply with Texas Rule of Civil Procedure 292 as required by due process, because it was impossible to determine if the same ten jurors agreed as to one or more grounds for termination. 56 S.W.3d at 215.
*249 In its analysis, the B.L.D. majority noted that Rule 277 was "revisited" by the Supreme Court of Texas in Crown Life, and that the supreme court disapproved of broad-form submission when "valid and invalid theories of liability were included in a single broad-form question, making it impossible for the appellate court to review whether the jury found for the plaintiff on any valid theory." Id. at 216 (discussing Crown Life, 22 S.W.3d at 389). The majority of the Waco court concluded in B.L.D. that due process requires strict compliance with Rule 292 in termination cases, and "[t]o comport with due process, [separate grounds] cannot be submitted in the disjunctive, at least not without sufficient instructions to require the jury to agree by ten or more jurors which ground, if any, was committed by each parent with respect to each child." Id. at 218-19.
In B.L.D., the majority held that, because it could not determine whether ten jurors concurred on a single ground, use of a broad-form charge to submit multiple disjunctive grounds for termination violated due process. Id. at 219. A close examination of the majority opinion, however, shows that the basis for the ultimate holding in B.L.D. was not Crown Life.[7] Instead, the majority in B.L.D. analogized termination cases to criminal cases and relied upon the Texas Court of Criminal Appeals' decision in Francis v. State, 36 S.W.3d 121 (Tex.Crim.App.2000) in holding that broad-form submission violated due process. 56 S.W.3d at 217-18 (discussing Francis, 36 S.W.3d at 124 (prohibiting disjunctive submission of separate criminal offenses to the jury as violating due process)).
On the one hand, no issue was raised in Crown Life as to any violation of due process by disjunctive submission. On the other hand, E.B. unequivocally held that the broad-form jury charge does not violate the due process rights of parents in termination cases. 802 S.W.2d at 649. Without further guidance from the supreme court, it is difficult to see how Crown Life necessarily impacts the holding in E.B. that a broad-form submission of multiple grounds for termination comports with due process. Therefore, we cannot agree with the B.L.D. majority opinion that broad-form jury charge submissions are per se violative of due process in termination cases. 56 S.W.3d at 219. We agree with the dissent that such a holding seems inconsistent with both Crown Life and E.B.[8]Id. at 220 (Gray, J., dissenting).
Furthermore, Crown Life and E.B. are, themselves, not inconsistent. Each case *250 speaks to different concerns regarding broad-form jury submissions. Under E.B., due process is not violated by a broad-form submission under Rule 277 of alternative theories, i.e., grounds for termination. 802 S.W.2d at 649. In contrast, under Crown Life, Rule 277 is not violated by reversing where, over proper objection, an invalid theory is included in a broad-form submission because in such a case it is not feasible to submit a broad-form jury charge. 22 S.W.3d at 388.
In this case, all four grounds for parental termination were proper because there was legally sufficient evidence supporting submission of each ground. Additionally, the jury was instructed that the same ten of them must agree on the verdict and all of the answers made. We are bound to presume that the jury followed these instructions, absent any proof to the contrary. Turner, Collie & Braden, Inc. v. Brookhollow, Inc., 642 S.W.2d 160, 167 (Tex.1982); Gray v. Floyd, 783 S.W.2d 214, 216 (Tex.App.-Houston [1st Dist.] 1990, no writ).
Having held that there was legally and factually sufficient evidence of each of the grounds for termination submitted by the instructions accompanying the broad-form termination question, and absent any other complaint as to the validity of the grounds presented, we hold that the grounds for termination were properly included in the jury instructions accompanying the broad-form questions as to termination. See In re K.S., 76 S.W.3d 36, 47-48 (Tex.App.-Amarillo 2002, no pet. h.) (holding due process argument as to broad-form disjunctive submission foreclosed by E.B. and Crown Life inapplicable absent submission of invalid ground); M.C.M., 57 S.W.3d at 31 (broad-form submission in parental rights termination case proper under E.B.). We hold that Marium's due process rights were not violated by the trial court's use of the broad-form jury charge. Consequently, we overrule Marium's eighth issue.

VII. LACK OF AFFIRMATIVE DEFENSE INSTRUCTION
In Marium's seventh issue she argues that the trial court erred in denying, over proper request, an instruction and definition on an affirmative defense to the alleged failure to comply with a court order to pay child support. In support of her affirmative defense, Marium relies upon section 157.008(c) of the family code.
Section 157.008(c) provides, in pertinent part, "[a]n obligor may plead as an affirmative defense to an allegation of contempt or of the violation of a condition of community service requiring payment of child support...." Tex. Fam.Code Ann. § 157.008(c) (Vernon 1996). However, the family code requires a showing of failure to pay in accordance with one's ability to pay. In re R.R.F., 846 S.W.2d 65, 68 (Tex.App.-Corpus Christi 1992, writ denied); Jimenez ex rel. Little v. Garza, 787 S.W.2d 601, 604 (Tex.App.-El Paso 1990, no writ). When the trial court establishes the amount of child support that a parent is to pay, the court must consider the parent's ability to contribute to the child's support. R.R.F., 846 S.W.2d at 68. The child support order includes within it an implicit finding that the parent has the means to pay the amount ordered. Id. The State responds that Marium has waived this issue because she did not plead the affirmative defense per Texas Rule of Civil Procedure 94. Tex.R. Civ. P. 94.
Here, the first question is whether family code section 157.008(c) applies to this termination case so as to enable Marium to invoke inability to pay support as an affirmative defense. We note that actions for termination are similar to contempt proceedings when failure to support as *251 ordered is a basis of the action. R.R.F., 846 S.W.2d at 68. In both contempt and termination proceedings, the rights of the non-paying parent are in jeopardy, either through the vehicle of incarceration or by loss of parental rights. Id. We conclude that, in a termination proceeding, inability to pay support under a valid order is an affirmative defense and, as such, it must be pled by the party defending a charge of failure to pay support to avoid waiver. Id.; Tex.R. Civ. P. 94.
Section 157.008(c) provides that the obligor must prove that he or she:
(1) lacked the ability to provide support in the amount ordered;
(2) lacked property that could be sold, mortgaged, or otherwise pledged to raise the funds needed;
(3) attempted unsuccessfully to borrow the funds needed; and
(4) knew of no source from which the money could have been borrowed or legally obtained.
Tex. Fam.Code Ann. § 157.008(c). A successful defense under section 157.008(c) requires proof of all four prerequisites. Ex parte Bregenzer, 802 S.W.2d 884, 887 (Tex.App.-Houston [1st Dist.] 1991, orig. proceeding). Furthermore, a defendant relying on this affirmative defense must plead, prove, and secure findings to sustain the defense. In re C.M., 996 S.W.2d 269, 270 (Tex.App.-Houston [1st Dist.] 1999, no pet.); see Woods v. William M. Mercer, Inc., 769 S.W.2d 515, 517 (Tex.1988).
The facts reveal Marium failed to plead inability to pay child support prior to trial. At trial, Marium objected to the trial court's failure to submit an instruction on the affirmative defense of inability to pay in connection with submission of the ground of failure to comply with the court's temporary order regarding child support, and also tendered written instructions submitting that affirmative defense, which were refused. The evidence reveals Marium was ordered to pay $117.50 per month. Marium paid a total of $30 for the entire period in question.
The record further provides that Marium did not present evidence at trial that she could not pay child support. Marium did not present evidence that she attempted to borrow money or that she knew of no source from which the money could have been borrowed or legally obtained, and did not present corroborating evidence of her income and expenses. At best, Marium guessed that she made $700 a month, and provided various estimates regarding her expenses. However, none of her estimates were verified with documentation. Testimony from Helen Coffer, a TDPRS parent worker, provided evidence that Marium declined to pay child support because she felt that as long as CPS had her children, CPS could pay for them.
Based on the above evidence, we hold that the trial court did not err in denying Marium's affirmative defense jury instruction regarding inability to pay child support because she failed to plead, prove, and secure findings to sustain her affirmative defense and, thus, has waived the issue. See C.M., 996 S.W.2d at 270 (holding defendant waived violation of Americans with Disabilities Act as affirmative defense to parental rights termination because of failure to plead, prove, and secure findings). Consequently, we overrule Marium's seventh issue.

VIII. CONCLUSION
Having overruled all of Marium's issues, we affirm the trial court's judgment terminating her parental rights to J.M.M., B.R.M., and W.T.M.
NOTES
[1] Among Adams's considerations were: (1) Marium left the Mission; (2) Marium returned to James after he was convicted of child abuse; (3) both Marium and James had a history of child abuse growing up, and (4) James had a history of mental illness and admitted drug use. Based on these considerations, Adams concluded that the children should be removed and placed into temporary foster care.
[2] The jury was instructed that it must also be proven by clear and convincing evidence that termination of the parent-child relationship would be in the "best interest" of the child. In that connection, the instructions provided a list of factors to consider in determining the best interest of the child taken from Holley v. Adams. 544 S.W.2d 367, 371-72 (Tex. 1976). Marium has not challenged the propriety of the submission or the legal or factual sufficiency of evidence regarding best interest.
[3] See Austin v. Healthtrust, Inc.The Hosp. Co., 951 S.W.2d 78, 80 (Tex.App.-Corpus Christi 1997) (noting the duty to follow the Texas Supreme Court), aff'd, 967 S.W.2d 400 (Tex.1998); Johnson v. Pettigrew, 786 S.W.2d 45, 48 (Tex.App.-Dallas 1990, no writ) (same); see also Cantu v. Peacher, 53 S.W.3d 5, 12 n. 2 (Tex.App.-San Antonio 2001, pet. denied) (Angelini, J. concurring).
[4] Former Rule 81(b)(1) is codified without substantial change as Texas Rule of Appellate Procedure 44.1(a). Tex.R.App. P. 44.1(a).
[5] The more commonly invoked ground for harmful error is the first stated ground that the error complained of "probably caused the rendition of an improper judgment." Tex. R.App. P. 41.1(a)(1).
[6] We have found no court of appeals case extending Crown Life to error in submission of a liability theory supported by no evidence. Courts of appeals are split as to whether Crown Life extends to cases where an element of damages should not have been submitted because of lack of supporting evidence. Compare Wal-Mart Stores, Inc. v. Redding, 56 S.W.3d 141, 154-55 (Tex.App.-Houston [14th Dist.] 2001, no pet.) (reviewing court must presume error harmful in submitting element of damages supported by no evidence and jury question did not require separate findings), and Iron Mountain Bison Ranch, Inc. v. Easley Trailer Mfg., Inc., 42 S.W.3d 149, 157 (Tex.App.-Amarillo 2000, no pet.) (error harmful under Crown Life when no evidence supported submission of lost profits), with Harris County v. Smith, 66 S.W.3d 326, 333 (Tex.App.-Houston [1st Dist.] 2001, pet. granted) (holding Crown Life's presumed harm analysis does not apply when trial court erroneously submits elements of broad-form damages question).
[7] There was no complaint in B.L.D. that valid and invalid theories of liability were submitted in a single broad-form submission as in Crown Life. The B.L.D. majority's only relevant legal discussion of Crown Life is: "After Crown Life, the submission of disjunctive broad-form questions in termination cases, at least without appropriate instructions to guard against a less-than-consensus verdict, is no longer automatic." 56 S.W.3d at 216.
[8] Because B.L.D. holds that the broad-form jury charge violates due process rights of parents through the creation of a conflict between Rules 277 and 292, the court's holding is in conflict with E.B. Compare E.B., 802 S.W.2d at 649 (holding broad-form submission does not violate due process), with B.L.D., 56 S.W.3d at 219 (concluding broad-form submission did not allow appellate review; thereby violating due process). While B.L.D. distinguishes E.B., because that case did not analyze Rule 292, it is important to note that the E.B. court did acknowledge ten jurors agreed appellant endangered her children. B.L.D., 56 S.W.3d at 215-16; see E.B., 802 S.W.2d at 649 (noting ten jurors agreed on termination); see also In re M.C.M., 57 S.W.3d 27, 31 n. 2 (Tex.App.-Houston [1st Dist.] 2001, no pet.) (following E.B. and holding trial court properly submitted the controlling issue in that case through its broad-form submission).