# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-03-00273-CV

**Vanessa Carr, Appellant**

**v.**

**Texas Department of Protective and Regulatory Services, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 126TH JUDICIAL DISTRICT NO. FM107107, HONORABLE CHARLES F. CAMPBELL, JR., JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Appellant Vanessa Carr appeals from the trial court's final decree terminating her parental rights to her three children, K.C., D.B., and J.T.C., entered following a jury trial. We affirm the district court's judgment.

### Sufficiency of the Evidence

In her third issue, Carr contends the evidence is legally and factually insufficient to support the jury's verdict that her parental rights should be terminated and that there is insufficient evidence to support any of the grounds put forth by the State. The jury charge stated that for Carr's parental rights to K.C. and D.B. to be terminated, the jury must find by clear and convincing evidence that Carr had (1) knowingly placed or allowed the children to remain in conditions that endangered the children, (2) engaged in conduct or knowingly placed the children with people who

engaged in conduct that endangered the children, (3) constructively abandoned the children for at least six months, or (4) failed to comply with a court order setting out actions necessary for the children's return. With regard to Carr's parental rights to J.T.C., the charge stated that Carr's rights could only be terminated if there was clear and convincing evidence that she had (1) knowingly placed or allowed J.T.C. to remain in conditions that endangered her, or (2) engaged in conduct or placed J.T.C. with persons who engaged in conduct that endangered her.

*Standard of Review*

A trial court may terminate a parent-child relationship if it finds that the parent has engaged in any of the conduct set out as statutory grounds for termination and that termination is in the child's best interest; the Department must establish these elements by clear and convincing proof. Tex. Fam. Code Ann. § 161.001 (West 2002); *In re C.H.*, 89 S.W.3d 17, 23 (Tex. 2002). Clear and convincing evidence is an intermediate standard of proof falling between proof beyond a reasonable doubt and the preponderance of the evidence. *C.H.*, 89 S.W.3d at 23-25. The clear-and-convincing standard requires a "degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations" supporting termination. *Id*. at 23 (quoting *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979)). We review the legal sufficiency of the evidence by considering "all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We must maintain appropriate deference to the fact finder by assuming that it resolved evidentiary conflicts in favor of its finding when reasonable to do so; we disregard evidence that a reasonable fact finder could have disbelieved or found incredible.

*Id.* We review factual sufficiency by viewing all the evidence and deciding whether a reasonable fact finder could have resolved disputed evidence in favor of its finding. *Id.* If, after such a review, the disputed evidence is such that a reasonable fact finder could not have formed a firm belief about the truth of the State's allegations, the evidence is factually insufficient. *Id.*; *C.H.*, 89 S.W.3d at 25.

*Summary of the Evidence*

Carr was almost twenty-one years' old at the time of trial in April 2003, K.C. was six, D.B. was three, and J.T.C. was almost five months' old. K.C. was taken into protective Department custody in October 2001, D.B. was taken into protective custody in about June 2002, and J.T.C. was taken into custody in early December 2002 when she was about two weeks' old. Carr became pregnant with K.C. when she was thirteen years' old, as a result of a rape by Kenneth Terrell, a close family friend referred to as a godfather and a stepfather. Terrell first sexually assaulted Carr when she was about eleven years' old, but her family, including her mother, refused to believe that she had been assaulted until she became pregnant with K.C. Terrell was convicted of sexual assault and was in prison at the time of Carr's termination trial.

In 1998, Carr was referred to the Department because she let Terrell's wife babysit K.C. although Terrell's wife had seven referrals to the Department, largely based on allegations of substance abuse. Carr was again referred to the Department in October 2001 because her mother, Sheryl Johnson, stated that she was K.C.'s primary caretaker at a juvenile court proceeding during which she and Carr's fifteen or sixteen year-old brother both appeared to be intoxicated and tested positive for crack cocaine. Carr and K.C. were living with her mother and brother at the time, and K.C. shared a room with Carr's teenaged brother. K.C. appeared to be on target developmentally

3

and did not show signs of mistreatment when taken into Department custody. There was testimony that when the Department attempted to locate D.B., Carr said that she did not know where he was and then that he was with Marcus Williams[1] but that she did not have contact information for Williams. D.B. was eventually removed from Williams due to drug abuse and marital discord in the home; he was then placed in the same foster home with K.C.

Celeste Richmond, Carr's caseworker, stated that Carr's service plan required her to complete a parenting class and a psychological exam, obtain and maintain employment, and keep the Department notified of any change of address or telephone number. The Department provided Carr with basic household supplies and clothing appropriate for an interview. Richmond said that initially Carr's apartment was appropriate. However, as time went on, it was clear that "someone was smoking marijuana, and a lot of it, in that apartment." When asked, Carr said her guests were smoking, not Carr herself. Carr was instructed not to allow marijuana smoking in her apartment.

Richmond testified that in December 2001, Carr was first instructed to stop all drug use and was told that future visits with her children would be contingent on clean drug tests. The State introduced evidence that at least five drug tests from early 2002 indicated marijuana use and one also showed cocaine use. In January 2002, Richmond started canceling Carr's visits because of positive drug tests. Richmond occasionally allowed visitation when Carr's test results were not back, and at least once mistakenly allowed visitation in spite of a positive test result. When a test

---

[1] Carr thought that either Williams or another man was D.B.'s father. However, blood tests ruled out both men as the father, and Carr did not know who else the father could be.

4

indicated cocaine use, Carr denied using cocaine, saying she was taking a prescription for headaches. However, according to the drug lab, such medication usually tests as amphetamine and does not give a false positive for cocaine.

Richmond said that although Carr initially seemed very interested in completing the service plan, making changes in her life, and being reunited with her children, Carr's behavior grew less and less cooperative. Richmond said Carr sometimes did not come to scheduled visits with K.C., which distressed K.C. Carr also missed several scheduled appointments for a psychological exam, and did not complete the exam until October 2002, almost a year after it was ordered. After Carr failed successive drug tests and had visitations cancelled, she eventually stopped contacting Richmond; Carr did not see her two oldest children after February 2002, and her phone was disconnected in April. When D.B. was moved into the same foster home as K.C., Richmond had to send Carr a letter informing her of the changes, stating that she had tried several times to call Carr and had also left messages at Carr's mother's house. Carr had not obtained or maintained employment, nor had she completed the court-ordered drug assessment, attended psychological therapy, finished inpatient drug treatment, or completed a court-ordered parenting class.[2] Richmond said Carr never provided a clean drug test. Richmond last saw Carr in December 2002 at J.T.C.'s removal hearing, and Carr never contacted Richmond to try to arrange a visit with J.T.C.

---

[2] When the Department became involved with Carr, she had already completed a parenting class through Any Baby Can. The Department therefore enrolled her in a more advanced class aimed at parents with slightly older children. Carr attended only one class and then stopped going.

5

On November 25, 2002, the Department was contacted because at her birth, J.T.C. tested positive for marijuana and weighed only four pounds, five ounces. The Department could not find J.T.C. until she was about two weeks' old because Carr had placed J.T.C. with her friend, Sheri Milligan. When J.T.C. was found, she had lost weight because Milligan had been using regular bottles instead of bottles designed for premature babies, and she weighed three pounds, twelve ounces. Richmond was very concerned about J.T.C. because she was tiny when she was born, and then lost weight during her placement with Milligan. Carr wanted J.T.C. placed with Milligan, but Milligan cancelled that process midway through because she was having personal problems; Richmond also said Milligan's fiancé had an open case with the Department.

Richmond said the initial goal was to reunite Carr with her children. However, that goal changed due to Carr's continued drug abuse and emotional and mental health issues. Richmond did not believe Carr could be an adequate parent until she addressed those problems. Richmond believed that Carr had endangered D.B. and K.C. by leaving the children with inappropriate care givers, including her mother, Williams, and, when K.C. was an infant, Terrell's wife. Richmond believed Carr was a danger to J.T.C. because J.T.C. tested positive for drugs at birth; Carr also continued to make poor decisions such as leaving J.T.C. with a person who had a "history" with the Department and with whom J.T.C. lost weight because of improper feeding.

Dr. John Gould performed Carr's psychological exam in October 2002. He testified that Carr suffered from severe depression, anxiety, and post-traumatic stress disorder, and expressed suicidal thoughts, mostly associated with the possibility of losing her children, and homicidal thoughts toward her Department caseworker. Dr. Gould recommended that Carr take psychotropic

6

and antidepressant medications and undergo therapy, substance abuse treatment, and parenting classes. Dr. Gould did not believe that, as of October, Carr was psychologically or emotionally capable of caring for her three young children, and said she would need assistance, treatment, and medication to do so.

When K.C. was five and D.B. was two, the children were referred to a therapist because they were throwing severe temper tantrums and acting out sexually and K.C. was lying and being manipulative.[3] Tania Glenn, their therapist, said her sessions with K.C. were notable because of the "severe sexual overtone." K.C. talked about oral sex during therapy, saying Carr had engaged in such acts in front of her. K.C. grew angry and upset when she discussed the subject, and often used very vulgar words during therapy. Glenn also said that K.C. described Carr's drug use to her foster mother, although the subject did not come up in therapy. Glenn knew K.C.'s foster mother, and did not believe K.C. had learned her sexual behavior in the foster home because she had been in that home for a very short amount of time when she began acting out and her foster mother did not allow men in the house and would never use such graphic language. Glenn stated that K.C. had not bonded with her mother properly and suffered from post-traumatic stress disorder, but that her behavior and language had improved as she worked through her traumatic memories. Glenn said

---

[3] When Richmond first met D.B., he would throw temper tantrums so severe that he would make himself sick and would eat until he made himself sick. After he was placed in foster care with K.C., the severity of his tantrums decreased significantly and his behavior improved. Richmond observed Carr with D.B., and said that there did not seem to be a bond between them and that D.B. did not respond to Carr's attempts to calm him during a temper tantrum.

7

both children needed a very structured, consistent, loving, patient environment with parents who could provide for their needs and give supervision. She believed that continued contact with Carr would be harmful to K.C. and D.B. because they have very negative thoughts about her, have not expressed any desire to see her, and would be afraid if they did see her. Glenn testified that it was in the children's best interests that Carr's parental rights be terminated.

An Austin police officer testified that neighbors and passers-by complained about drug dealing at Carr's apartment. Carr was frequently seen with drug dealers, and was arrested in July 2002 for drug possession while she was pregnant with J.T.C. During one search of her apartment, police officers found crack cocaine and marijuana; Carr denied that the cocaine was hers. During another search, "[a] large cloud of marijuana smoke came rushing out as soon as they opened the door"; newborn J.T.C. was in the apartment at the time.

Carr denied ever being sexually active in front of her children. She said K.C. may have seen sexual behavior on television because she would sometimes turn on the cable channels late at night. Carr never saw K.C. or D.B. act out sexually and never got reports from school or relatives of inappropriate behavior.

Carr admitted that she was informed that she had to take a drug test before she visited her children, but denied being told that she had to stop using drugs. Carr said her caseworker kept telling her that the drug tests were clean and did not understand why the Department would have allowed her to see her children if her tests were positive. Carr denied using crack cocaine, and said she never used drugs or even smoked cigarettes in front of her children. Carr testified that when she found out she was pregnant with J.T.C., she stopped smoking marijuana, and said J.T.C. tested

8

positive for marijuana because there was only one umbilical artery. Carr also testified that she had stopped using marijuana only three weeks before trial. Carr said she placed J.T.C. with Milligan because she did not want the State to be able to say J.T.C. was in an unsafe environment.

Carr testified that she struggled with depression while pregnant with D.B., sought treatment, and was prescribed medication. However, she discontinued the medication because it did not help and made her sleepy. She stopped taking her medication altogether when she got pregnant with J.T.C. Carr said she still suffers from depression at times. She denied ever saying she had suicidal thoughts. Carr completed two weeks of a four-week drug treatment program, but stopped because of family problems.

Carr testified that she had not found employment since the children were removed, but she said she had looked for work and filled out many applications. She does not have a high school diploma or a GED certificate, and said she had not found a program that would help her get her GED. Carr said she complained to her apartment manager about the drug activity around her apartment, but was told it was the only apartment available. At the time of trial, Carr did not have a job, was getting food stamps, and was getting help from her mother to pay her utilities. However, she said if she had her children, "it would be a whole another different story," and she would get a job to support them or find money somehow, saying "I can get money from anywhere." Carr said she stopped contacting the Department because she had a personality conflict with Richmond. Carr said, "I have no excuse for not completing my service plan, you know. I did some of it. I didn't do some of it. I'm sorry. . . . [I]t seemed like every time I did something it wasn't right. It wasn't good

9

enough." Carr said she loved her children and would be able to support them somehow. She also said she would be sure that they attended and succeeded in school.

*Discussion*

The evidence in this cause is legally and factually sufficient for a reasonable trier of fact to form a firm conviction that Carr's parental rights should be terminated based on any of the alleged grounds. There was evidence that Carr, who suffers from depression, went off her medication and had suicidal and homicidal thoughts. There was evidence that she frequently smoked marijuana and allowed her infant to stay in an apartment filled with marijuana smoke. K.C.'s therapist testified that K.C. reported seeing her mother engaged in sexual activity and drug use, and stated she did not believe that K.C. learned vulgar words or sexual behavior in her foster home. While Carr's children were out of her custody and she was supposed to be taking parenting classes and getting counseling, she continued to abuse marijuana and tested positive for cocaine on one occasion. Carr dropped out of her drug treatment program and waited for nearly a year before completing the court-ordered psychological exam. Dr. Gould did not believe Carr could be an adequate parent until she obtained counseling, and Richmond believed Carr was a danger to her children because Carr continues to make poor choices and use drugs. Although Terrell sexually abused Carr as a child and Terrell's wife had numerous referrals to the Department for substance abuse, Carr allowed Terrell's wife to babysit K.C. and even allowed her to attend K.C.'s birthday party after she had kidnapped K.C. in an attempt to get Carr to recant her allegations of sexual abuse. Carr's mother appeared in court high on cocaine, accompanied by Carr's teenaged brother, who was also high on cocaine, and told the court she was K.C.'s primary caretaker. Carr placed her newborn

10

with a friend who did not use the right bottles to feed her, resulting in a weight loss for the tiny infant; that friend's fiancé had an open Department case pending. Finally, Carr essentially ceased contact with the Department in February 2002, and did not see her older children for more than a year. It was for the jury to hear the evidence and disregard evidence that a reasonable fact finder could have disbelieved or found incredible. We cannot hold that the evidence is insufficient to support the jury's verdict. We overrule Carr's third issue on appeal.

## Jury Charge

In her first issue on appeal, Carr contends that the jury charge, which included multiple grounds for termination in one broad-form question, violated Carr's right to procedural due process because it did not (1) require the jury to identify the grounds for termination or (2) require that ten jurors agreed on any one ground for termination. In her second issue, she contends that the multiple-issue question violates section 161.001 of the family code and could subject her and other parents in similar circumstances to erroneous termination of parental rights to future-born children.

Although the jury charge stated that Carr's parental rights to K.C. and D.B. could be terminated if clear and convincing evidence established one of four grounds for termination, the charge asked in a broad-form question simply whether Carr's rights to K.C. and D.B. should be terminated. Likewise, with regards to J.T.C., the charge allowed for Carr's rights to be terminated based on two grounds, but asked simply whether Carr's rights to J.T.C. should be terminated. To both broad-form questions, the jury answered "yes." In the charge's general instructions, the jury was instructed that "[t]he same ten or more of you must agree upon all the answers made and to the entire verdict."

11

Carr argues that the broad form submission improperly lowered the State's burden of proof and made it impossible to be sure on which ground ten or more jurors agreed. Carr acknowledges that in *Texas Department of Human Services v. E.B.*, the supreme court approved of the use of broad-form questions in termination cases. 802 S.W.2d 647, 649 (Tex. 1990). She contends, however, that *E.B.* must be harmonized with the more recent decision in *Crown Life Insurance Co. v. Casteel*, in which the supreme court held that it is harmful error to submit to a jury a single broad-form question that "commingles valid and invalid liability theories." 22 S.W.3d 378, 389 (Tex. 2000). Carr argues that the grounds for termination are analogous to damages theories. She contends that because the evidence is insufficient to support the jury's findings as to each of the asserted grounds, allowing the jury to find that her parental rights should be terminated without determining on which ground or grounds the jury relied violates her rights to due process because the termination may be based on a ground that lacks evidentiary support.

In this case, we have held that sufficient evidence supports each of the grounds for termination of Carr's parental rights to her children. Therefore, we need not decide whether it is error to submit in a broad-form question a ground for termination not supported by legally sufficient evidence.[4] *See In re J.M.M.*, 80 S.W.3d 232, 249-50 (Tex. App.—Fort Worth 2002, pet. denied). Furthermore, as noted in *J.M.M.*, absent evidence to the contrary, we must presume that the jury

---

[4] This Court has held that *Crown Life* does not apply in cases where disjunctive allegations track statutory language, as the jury charge does in this cause. *See Cox v. Texas Dep't of Protective & Regulatory Servs.*, No. 03-01-00511-CV, 2002 Tex. App. LEXIS 3651, at *7 n.3 (Austin May 23, 2002, pet. denied) (not designated for publication).

12

followed the trial court's instructions that the same ten or more of them must agree on the verdict and all the answers made. *Id*. at 250. We overrule Carr's first issue on appeal.

As for Carr's second issue, we have held that sufficient evidence supports the termination of her parental rights to K.C. and D.B. based on findings under section 161.001(1)(D) or (E), that she either engaged in conduct or knowingly allowed her children to remain in conditions or with persons who engaged in conduct that endangered the children. *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E). Such grounds could later allow for the termination of Carr's rights to future children under subsection (M), which provides for termination if parental rights have been terminated with respect to another child based on subsections (D) or (E). *See id*. § 161.001(1)(M). Furthermore, Carr's rights to J.T.C. were terminated based only on subsections (D) or (E). Therefore, should the Department seek in the future to terminate Carr's rights to other children based on subsection (M), such termination would not be erroneously based on a subsection other than (D) or (E). We overrule Carr's second issue.

We affirm the district court's judgment.

_____

Jan P. Patterson, Justice

Before Chief Justice Law, Justices B. A. Smith and Patterson

Affirmed

Filed: January 8, 2004

13