# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

NO. 03-05-00244-CV

**Ramona Harris, Appellant**

**v.**

**Texas Department of Family and Protective Services, Appellee**

FROM THE DISTRICT COURT OF HAYS COUNTY, 207TH JUDICIAL DISTRICT
NO. 00-0684-A, HONORABLE DONALD V. HAMMOND, JUDGE PRESIDING

## D I S S E N T I N G   O P I N I O N

I agree that the trial court may not contravene the jury's finding on the issue of the appointment of the sole managing conservator. *See* Tex. Fam. Code Ann. § 105.002(c)(1)(A) (West Supp. 2006).[1] But this does not relieve us from our role in reviewing the jury's verdict for legal sufficiency. Because the jury's verdict is legally insufficient, it is error to reverse the trial court's order disregarding that verdict and render judgment removing this child from foster parents

---

[1] This is an accelerated appeal pursuant to family code section 263.405(a). *See* Tex. Fam. Code Ann. § 263.405(a) (West Supp. 2006) (since September 1, 2001, an appeal from a final order terminating the parent-child relationship and appointing another as managing conservator is accelerated and governed by the rules for accelerated appeals in civil cases); *see also In re J.L.*, 163 S.W.3d 79, 81-82 (Tex. 2005). A final order was entered in April 2005, and Harris appealed to this Court that same month.

For reasons not explained in the record, Harris's counsel did not include the Department's original petition in the record before us and seems to be under the mistaken impression that this appeal arises from Harris's own petition to modify the parent-child relationship with respect to C.C.H. and not from the Department's petition to terminate parental rights.

with whom he has spent the last six years and sending him straightaway to a parent with whom he has spent only a handful of hours.[2] Having lingered in foster care for six years while the legal process determines whether he will remain with his foster parents, who have adopted his two older brothers and sister, this child must be the paramount focus here: What is in the child's best interest? Legal proceedings have immutably altered his life. Were we writing on a clean slate, we would hope to provide this child—and his parent—with what the legislature contemplated: a fair and expeditious proceeding with security, continuity, stability, certainty, and finality at its conclusion. But the slate is not clean.

After a trial in October 2001, this Court in April 2003 affirmed the termination of Harris's rights to her three other minor children, M.H., C.D., and K.D.[3] The Department alleged and proved that the parents:

> Knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered the physical or emotional well-being of the children in violation of Tex. Fam. Code Ann. § 161.001(1)(D) (West 2002), and
>
> Engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered the physical and emotional well-being of the children in violation of Tex. Fam. Code Ann. § 161.001(1)(E) (West 2002).

*See* Tex. Fam. Code Ann. § 161.001(1)(D)-(E). This Court observed that the rights of Ronald Williams, M.H.'s father, were terminated, but he did not appeal; nor had Steven Dietrick, the father

---

[2] There is an indication in the record that Harris had some visits with the child at the time of trial. For reasons not in the record, Harris was generally denied visitation.

[3] *Harris v. Texas Dep't of Protective & Regulatory Servs.*, No. 03-01-00643-CV, 2003 Tex. App. LEXIS 2842 (Tex. App.—Austin Apr. 3, 2003, no pet.) (mem. op.).

2

of C.D. and K.D, or Cleiffort Cooks-Harris, whose rights were terminated as to the child, C.C.H., who is the subject of the current proceeding. *Harris v. Texas Dep't of Protective & Regulatory Servs.*, No. 03-01-00643-CV, 2003 Tex. App. LEXIS 2842, at *3-4 (Tex. App.—Austin Apr. 3, 2003, no pet.) (mem. op.). The status of C.C.H. was not at issue in the prior appeal.[4] Among the issues in the prior appeal was Harris's motion for continuance which the trial court had overruled. This Court noted that the appeal was controlled by then recently enacted procedures requiring a finding by the trial court regarding the merits of the appeal[5] and that the "case was a little over a month away from dismissal under an already extended deadline." *Id.* When Harris sought a continuance, the Department urged that a continuance raised the risk that the case would not be heard in time for the statutory deadlines to be met, thereby resulting in its dismissal. In her second issue, Harris contended that the case of each of the three fathers should be severed and separated into a different cause and tried separately. This Court rejected the issues and affirmed the termination of Harris's parental rights to her three older children on the grounds of family code sections 161.001(D) and (E).

The instant appeal arises from the severed cause involving the termination of Harris's parental rights as to C.C.H. The Department alleged the following three grounds for termination of Harris's parental rights as to C.C.H.:

---

[4] For reasons not in the record, Harris's parental rights as to C.C.H. were severed and tried separately and are now the subject of this separate appeal.

[5] *See* Tex. Fam. Code Ann. § 263.405(b), (d) (West Supp. 2006) (*enacted by* Act of May 22, 2001, 77th Leg., R.S., ch. 1090, § 9, 2001 Tex. Gen. Laws 2397, 2397-98, effective Sept. 1, 2001, *amended by* Act of May 12, 2005, 79th Leg., R.S., ch. 176, § 1, 2005 Tex. Gen. Laws 332).

That Harris knowingly placed or knowingly allowed C.C.H. to remain in conditions or surroundings which endanger the physical or emotional well-being of the child in violation of section 161.001(1)(D);

That Harris engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangered the physical or emotional well-being of C.C.H. in violation of section 161.001(1)(E); and

That Harris had had her parent-child relationship terminated with respect to another child based on a finding that her conduct was in violation of section 161.001(1)(D) or (E) in violation of section 161.001(1)(M).

*See* Tex. Fam. Code Ann. § 161.001(1)(D)-(E), (M) (West Supp. 2006). At the end of a contentious trial, the court instructed the jury that, for the parent-child relationship to be terminated, one of the grounds must be proven by clear and convincing evidence and, further, that the jury must find that the termination is in the best interest of the child. *See id.* § 161.001. In a second question to the jury, the charge inquired whether the Department or Harris should be designated the permanent managing conservator; the jury was instructed that the answer to the question should be based upon a preponderance of the evidence.

After the jury returned a verdict finding that Harris's parental rights to C.C.H. should not be terminated and that Harris should be named managing conservator, the Department filed a motion for new trial on the ground that the jury's answer to the managing conservator question was against the great weight and preponderance of the evidence, manifestly unjust, and not in the child's best interest. The Department sought a new trial in the interest of justice and fairness. On behalf of the child, the attorney ad litem[6] filed a motion to designate the Department as managing

---

[6] At a hearing for the purpose of rendering a final order on March 18, 2005, the attorney ad litem was not present and had notified the court that he was seriously ill and would be unable to

4

conservator. Citing the best interest of the child, C.C.H.'s attorney reminded the court that Harris's parental rights to her three older children had been terminated on endangerment grounds, that Harris's therapists had testified that she admitted to a history of alcohol and drug abuse, that she had a history of associating with and having relationships with individuals with criminal records, that the parental rights of the child's father had been terminated and he had been jailed for violating a protective order, that both parents had violated the protective order leading to the father's incarceration, and that the child had lived his entire life in the home of foster parents who had adopted his three older siblings. C.C.H.'s attorney urged that the Department be named sole managing conservator for the sake of the child's safety and well-being, and that Harris be named possessory conservator.

At a hearing held on April 1, 2005, the court set aside the jury's finding on the issue of conservatorship and, in accordance with the attorney ad litem's motion, appointed the Department as the sole managing conservator of the child. The trial court entered a final order confirming the jury's finding that Harris's parental rights were not terminated and concluding that the jury's finding that Harris be named sole managing conservator instead of the Department was against the great weight of the evidence and not in the best interest of the child. Specifically, the court rendered the following order:

---

attend. Harris's attorney objected to any further postponement and observed that the attorney had not filed any post-trial motions. In fact, the attorney ad litem's motion to designate the Department as managing conservator of the child was filed on the date of the hearing. In any event, on April 1, 2005, a second attorney ad litem was substituted for the original attorney ad litem, who died in July 2005. The record does not show that the second attorney ad litem ever appeared in a proceeding.

5

The Court orders that the finding of the jury that it is not in the best interest of the subject child that the Department of Protective and Regulatory Services be named Managing Conservator of said child is against the greater weight and degree of the credible evidence herein and is not in the best interest of the subject child, and such finding is set aside.

On appeal, Harris attacks the trial court's order by first contending that this case was brought by Harris as petitioner in a suit to modify the parent-child relationship, that the "Department never made any affirmative pleadings or requests for relief in this action," and "never [re]quested termination in this case."[7] If, however, this were an appeal from Harris's petition to modify, she would have had the burden to show that the modification was in the best interest of the child and that the circumstances of the child, the conservator, or another party affected by the order had materially and substantially changed since the rendition of the order. *See id.* § 156.101 (West Supp. 2006). Contrary to Harris's assertion, this appeal arises from a suit for termination of parental rights. Because Harris never addresses the issues as they relate to the petition to terminate and fails to include the petition and appropriate citations to authorities and to the record, I would hold first that she has not preserved error and does not present anything for review. *See* Tex. R. App. P. 38(h).

The cynosure of Harris's appeal and the majority opinion is that the trial court erroneously disregarded the jury's answer to question two by naming the Department as managing conservator in violation of section 105.002 of the family code. To be sure, section 105.002 requires the trial judge to abide by the jury's determination on the issue of managing conservatorship. Tex. Fam. Code Ann. § 105.002. The court may not enter a judgment

---

[7] Perhaps this is the reason Harris failed to include the Department's petition for termination as to the four children—but severed as to C.C.H.—in the record on appeal. *See supra* note 1.

notwithstanding the verdict. *Lenz v. Lenz*, 79 S.W.3d 10, 20 (Tex. 2002). But that is not the end of our review. The jury finding is binding upon the court only when supported by the evidence as in any other civil action where the parties have a right of trial by a jury. *Id.*; *see also In re Rodriguez*, 940 S.W.2d 265, 271 (Tex. App.—San Antonio 1997, writ denied); *Fambro v. Fambro*, 635 S.W.2d 945, 947 (Tex. App.—Fort Worth 1982, no writ).

Thus, the appropriate challenge must be directed to a traditional sufficiency review: Is the evidence legally and factually sufficient to support the jury's finding that appointing Harris as the child's managing conservator was in his best interest? *Lenz*, 79 S.W.3d at 26-27. Recognizing the strong presumption that the best interest of the child is generally served by preserving the parent-child relationship and giving the jury's decision substantial deference in accordance with our standards of review, I would hold that the evidence is legally insufficient to support the jury's verdict and, instead, supports the trial court's disregard of the jury's finding regarding managing conservator.

In determining the issue of conservatorship, "[t]he best interest of the child shall always be the primary consideration." Tex. Fam. Code Ann. § 153.002 (West 2002). Although the majority sets forth the appropriate standard for a legal sufficiency challenge to the question of conservatorship, it fails to examine the evidence as it relates to the best interest of the child. Because the evidence regarding termination also contemplates the best interest of the child, *see* Tex. Fam. Code Ann. § 161.001(2), it bears a substantial relationship to the trial court's disregard of the jury's finding on conservatorship. *In re J.F.C.*, 96 S.W.3d 256, 264-65 (Tex. 2002).

7

One of the three grounds alleged by the Department was that Harris's parent-child relationship was terminated with respect to another child based on a finding that her conduct violated section 161.001(1)(D) or (E) in that she knowingly placed or allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child, or she engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child. *See* Tex. Fam. Code Ann. § 161.001(1)(M). A court may order termination if the factfinder finds by clear and convincing evidence that the parent-child relationship was terminated with respect to another child based on a finding of child endangerment under section 161.001(1)(D) or (E) or a substantially equivalent provision of another state's law. *Id*. When a prior decree of termination as to another child is properly admitted into evidence, the Department is not required to re-establish that the parent's conduct with respect to that child was in violation of section 161.001(1)(D) or (E). *In re J.M.M.*, 80 S.W.3d 232, 243 (Tex. App.—Fort Worth 2002, pet. denied). The Department need only show that the parent's rights were terminated as to the other child based on the appropriate findings. *Id*. at 242-43; *see also* Tex. Fam. Code Ann. § 161.001(1)(M). Thus, section 161.001(1)(M) is a separate and independent ground for termination:

> The court may order termination of the parent-child relationship if the court finds by clear and convincing evidence:
>
> (1)    that the parent has: . . .
>
> (M)    had his parent-child relationship terminated with respect to another child based on a finding that the parent's conduct was in violation of Paragraph (D) or (E) or substantially equivalent provisions of the law in another state.

8

Tex. Fam. Code Ann. § 161.001(1)(M).

The Department introduced into evidence a certified copy of the final order dated November 14, 2001, terminating Harris's parental rights to other children. Harris did not controvert this evidence. This evidence thus constitutes undisputed conclusive evidence of a violation of section 161.001(1)(M). *See City of Keller*, 168 S.W.3d at 815-16. We may not disregard it. *See Provident Am. Ins. Co. v. Castaneda*, 988 S.W.2d 189, 190 (Tex. 1998). We must consider undisputed evidence that does not support the verdict and set aside the jury's determination if we find the jury's decision to be unreasonable *or* we find undisputed evidence that does not support the jury's decision. *See City of Keller*, 168 S.W.3d at 821 (if the evidence allows only one inference, we may not disregard it). Likewise, we may not disregard the legislative choice to provide in the statutory scheme section 161.001(1)(M) as a ground for termination.[8] The undisputed evidence that

---

[8] Hence, the majority observes that most of the Department's evidence related to Harris's behavior with her older children because the Department removed C.C.H. the day after his birth. A finding of parental conduct endangering a child may also be based on the parent's conduct with regard to the child's siblings prior to the child's birth. *See, e.g.*, *Dallas County Child Protective Servs. Unit v. Bowling*, 833 S.W.2d 730, 733-34 (Tex. App.—Dallas 1992, no writ) (sexual abuse of oldest son before birth of child in question was evidence of course of conduct that endangered younger child); *Clark v. Clark*, 705 S.W.2d 218, 219 (Tex. App.—Dallas 1985, writ dism'd w.o.j.). A petition to terminate may be filed before a child is born. Tex. Fam. Code Ann. § 161.102 (West 2002). Conduct that occurred before the child's birth may be considered in determining whether a parent has endangered a child. *In re S.F.*, 32 S.W.3d 318, 322 (Tex. App.—San Antonio 2000, no pet.); *In re M.J.M.L.*, 31 S.W.3d 347, 351-53 (Tex. App.—San Antonio 2000, pet. denied). Moreover, conduct directed at another child may be sufficient to demonstrate a course of conduct that endangered a child's emotional well-being even if the abusive conduct was not committed in the child's presence. *E.g.*, *In re B.B.*, 971 S.W.2d 160, 169 (Tex. App.—Beaumont 1998, pet. denied); *Lucas v. Texas Dep't of Protective & Regulatory Servs.*, 949 S.W.2d 500, 503-04 (Tex. App.—Waco 1997, writ denied) (father endangered all his children when he sexually assaulted one of them). Even apart from the evidence involving other children, however, the termination of another child and its proof at this trial is conclusive evidence of a ground for termination under section 161.001(1)(M).

Harris's parental rights to other children had been terminated conclusively establishes a ground for termination that supports the trial court's disregard of the jury finding. Because this evidence also constitutes undisputed evidence that Harris's parental relationship endangered the safety of her children and that termination was in their best interest, *see* Tex. Fam. Code Ann. § 161.001(2) (in termination proceeding, court must find termination is in the best interest of the child), it is conclusive as well on the finding of best interest as it relates to the issue of C.C.H.'s conservatorship.[9] For this reason, the evidence relating to grounds for termination is relevant to the issue of conservatorship. But I will nevertheless examine separately the evidence relating to C.C.H.'s best interest.

Appellant asserts that the trial court failed to address the issue of the best interest of the child in its final order. A consideration of the best interest of the child must be viewed in light of the various factors that cabin the jury's and trial court's determinations. The charge instructed the jury to consider the *Holley* factors in determining the best interest of the child. *See Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976). These factors include the desires of the child; the emotional and physical needs of the child, now and in the future; the emotional and physical danger

---

[9] In a suit for termination of parental rights, family code section 161.205 authorizes the court to either deny the petition or render any order in the best interest of the child. Tex. Fam. Code Ann. § 161.205 (West 2002). Moreover, section 263.404 expressly authorizes the trial court to enter an order appointing the Department as managing conservator without terminating parental rights if the trial court finds that appointment of a parent as managing conservator would not be in the best interest of the child's because it would significantly impair the child's physical health or emotional development. *Id.* § 263.404(a) (West 2002). In light of the jury's decision not to terminate Harris's parental rights, the trial court's disregard of the jury's finding on conservatorship and presumed finding that it was not in the best interest of C.C.H. to appoint Harris as managing conservator comports with the court's authority under sections 161.205 and 263.404.

to the child, now and in the future; the parenting ability of the individuals seeking custody; the programs available to assist those individuals to promote the best interest of the child; the plans for the child of those individuals or by the agency seeking custody; the stability of the home or proposed placement; the acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one; and any excuse for the acts or omissions of the parent. *See id.* In 1993, the legislature codified those factors identified in *Holley* and incorporated additional factors for courts to consider when reviewing the placement of children under the care of the Department. *See* Tex. Fam. Code Ann. § 236.307 (West 2002). Section 263.307 provides the following factors for determining the best interest of the child:

    (1)    the child's age and physical and mental vulnerabilities;

    (2)    the frequency and nature of out-of-home placements;

    (3)    the magnitude, frequency, and circumstances of the harm to the child;

    (4)    whether the child has been the victim of repeated harm after the initial report and intervention by the department or other agency;

    (5)    whether the child is fearful of living in or returning to the child's home;

    (6)    the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home;

    (7)    whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home;

    (8)    whether there is a history of substance abuse by the child's family or others who have access to the child's home;

    (9)    whether the perpetrator of the harm to the child is identified;

(10)     the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision;

(11)     the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time;

(12)     whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with:

     (A)     minimally adequate health and nutritional care;

     (B)     care, nurturance, and appropriate discipline consistent with the child's physical and psychological development;

     (C)     guidance and supervision consistent with the child's safety;

     (D)     a safe physical home environment;

     (E)     protection from repeated exposure to violence even though the violence may not be directed at the child; and

     (F)     an understanding of the child's needs and capabilities; and

(13)     whether an adequate social support system consisting of an extended family and friends is available to the child.

*Id.*

Under a legal sufficiency review, we review the evidence in the context of these factors, considering as we must only the evidence and inferences tending to support the jury's finding and disregarding all evidence and inferences to the contrary. Noticeably absent from Harris's proof—and the majority opinion—is any evidence relating to the child's best interest.

In a glancing reference to the child's best interest, the majority references the rebuttable presumption that it is in C.C.H.'s best interest to be raised by his natural parent, Harris's

assertion that she had stable employment for over two years, Harris's denial of drug use, and testimony by witnesses that they had never seen Harris use drugs or act as though she was under the influence of an illegal drug. Indeed, the testimony regarding what was in C.C.H.'s best interest was sparse. The record shows that Harris never testified to what would be in the child's best interest; rather, she testified generally that she did not believe the foster parents, the CASA volunteer, and the guardian ad litem were acting in the child's best interest.

But there was ample testimony contrary to the jury's finding to support the trial court's disregard of that finding. Leslie Ontiveros, a supervisor of investigations for Child Protective Services for Hays and Caldwell Counties, testified that she first became involved with the family in October 1999. The Department had received a referral for the sexual abuse of C.D., Harris's seven-year-old daughter, by Harris's then boyfriend, Danny Gonzales. C.D. made an outcry statement to a teacher. But Harris did not believe her daughter and accused her of "making the story up." During her testimony, Harris acknowledged that she did not think the accusations were legitimate and that C.D. was not honest. She thought C.D. was probably mad because Harris had left C.D.'s father and C.D. was a "daddy's girl." When confronted with the "story," Gonzales did not protest the allegations and later pleaded guilty to indecency with a child, to wit, C.D.[10] Harris acknowledged that she took the children, including C.D., to jail to visit Gonzales once or twice. She agreed it was a poor choice, but she "wanted answers" and thought Gonzales was the one who could provide them. Harris thought it would be safe to take the children to the jail because jailhouses are safe and she couldn't find anyone to keep the children.

---

[10] The plea bargain agreement and judgment and sentence were introduced into evidence.

13

Testifying on her own daughter's behalf, Karen Bryant, Harris's mother, testified that she and Harris thought C.D. had also been abused by Harris's first husband as well because C.D. "was exhibiting some behaviors" that appeared to be from abuse. Bryant testified that Harris had been abused as a child by Bryant's second husband and had been to numerous therapists and counselors.

The Department received a second referral for neglectful supervision of the three children in May 2000. Ontiveros testified that she received information from law enforcement that Harris frequented a known crack house in San Marcos and that a sex offender also resided at the residence. Ontiveros tried to visit with the children at school, but one had been suspended and the other could not be located at school on that day or the next. C.D. confirmed to Ontiveros that Harris allowed the children to have contact with the known sex offender. At trial, Harris introduced evidence that the sex offender was not convicted until 2002. Although Ontiveros testified that Harris was cautioned about him earlier, Harris testified that she should not be charged with knowledge of his sex-offender status prior to his conviction. Ontiveros testified that when she received information that Harris was visiting a known crack house and had friends over to her residence to use crack, she went by Harris's house to check on the children. After speaking with the children, Ontiveros removed the children when Harris refused a drug test.

Ontiveros acknowledged that Harris tested positive for marijuana on one occasion, and that she was uncooperative and refused to be tested on numerous occasions. Harris did not believe she had a drug or alcohol problem and was resistant to participating in drug and alcohol screening and treatment. Harris participated in some psychological counseling, parenting classes,

14

and visits with her children, but she failed to complete her therapy and did not follow through on her visits with the children. Ontiveros testified that "[s]he was very confrontational in my dealings with her" and was angry that CPS was involved.

Harris's third husband, Cleiffort Cooks-Harris, whose parental rights to C.C.H. were terminated in 2001, testified that Harris obtained a protective order against him in January 2004 and that he had been arrested on two occasions for violating the order. The order arose out of a dispute between Cooks-Harris and Harris over his involvement with another woman and Harris taping his telephone calls with the woman. There was a physical altercation, Cooks-Harris pulled the telephone out of the wall, and Harris called the police and left to stay in a woman's shelter. A CPS investigator testified that Cooks-Harris pulled the telephone away from Harris, causing the cord to break and pull from the wall, and causing an injury to one of the children. Cooks-Harris complained that Harris pulled his hair out. Harris decided to file for divorce and to obtain a protective order. The order included the following findings:

> The Court finds that the Respondent has committed family violence against a member of the household and that family violence is likely to occur in the foreseeable future.
>
> The Court finds there is a clear and present danger that acts of family violence will be committed in the future.
>
> The Court finds that the Applicant and/or other members of the family or household will suffer immediate and irreparable injury, loss or damage for which there is no adequate remedy at law.
>
> The Court finds that the . . . Protective Orders are necessary for the prevention of family violence and are for the safety and welfare and in the best interest of the Applicant and for the protection of the minor children and other members of the family or household.

Cooks-Harris testified that from time to time he would babysit for Harris when she needed a babysitter. He was arrested twice for violation of the order and was in jail at the time of trial. In addition, Cooks-Harris had a 1981 conviction for aggravated assault, was unemployed, and had a prior protective order entered against him in 1992. He testified that he was unaware of the reason for the protective order, that perhaps his wife would know.

In her testimony, Harris testified that she called the police because her husband "challenged" her and obtained the protective order as a consequence of her anger. She had filed for divorce from Cooks-Harris and acknowledged that she would invite him to babysit despite the protective order, which she claimed she had tried to lift. Harris explained that "I was more afraid of the State than I was my own husband" and she was scared CPS "was coming."

Kelly Ragland, a CPS investigator in the conservatorship unit who replaced another worker with whom Harris had a difficult relationship, testified about efforts to reunite the family. Ragland described her efforts to keep Harris involved with therapy, drug and alcohol treatment, and visits with her children despite Harris's resistance to therapy, and "oppositional" and confrontational approach to CPS involvement. Ragland testified about her numerous efforts to have Harris attend therapy and visit her children:

> I would call the house to let her know things like the children had been moved from one placement to another or to let her know that we had visits scheduled for her. She would hang up the phone on me, she would tell me not to call her home anymore. Mr. Harris would get on the phone and say that we were never to call their home. I would send letters to the house to try to explain, you know, what needed to happen as far as what she needed to do. And she would occasionally call me back and she would leave me messages yelling on the phone. It was very, very difficult to work with Mrs. Harris.

16

Ragland testified that Harris initially refused to visit with the children unless they were all present, which was difficult because, at the beginning, they were each in different foster homes or treatment centers. When Ragland could arrange to have all four children present at the same time, Harris would then visit. On one occasion when Ragland had "finally accomplished visitation," she observed Harris explain to K.D. that he would have to testify in court. Ragland explained to Harris why this interaction was harmful to the children and left the room to observe her behavior from another room. Harris then showed K.D. a wedding photograph of her new husband, Cooks-Harris, to which K.D. expressed surprise. Ragland explained to Harris that she should discuss these matters with a caseworker before springing them on the children. When a caseworker questioned her conduct, Harris told her eldest child, M.H., that her rights were being violated, and Harris left the visit early. K.D. began crying, and M.H. tried to comfort him.

Ragland testified that she concluded Harris was not making an effort to visit with her children. Because setting up meetings by telephone became difficult and Harris would hang up on caseworkers seeking to set up visits, CPS began sending letters. On one occasion, at Harris's request, CPS had arranged for Harris to be transported by a CASA volunteer to the treatment center in another city where her daughter, C.D., was located. When Harris failed to appear for the trip, CPS learned that Harris had traveled to the treatment center and had an unsupervised visit with C.D. the day before.

On another occasion, Harris arrived with birthday presents for C.D., but left with the presents at the end of the visit. Harris testified that she did not want the gifts to be stolen while C.D. was residing at the treatment center. Similarly, at Christmas, Harris presented the children

17

with gifts only to pack them up at the end of the visit, explaining that they could have them when they came home.

On two separate occasions, CPS hired security for visits based on threats from Cooks-Harris. Ragland testified that she was present when Cooks-Harris threatened a worker. Ragland also testified that Harris failed to submit to drug tests and availed herself of visiting opportunities only two or three times during the course of six to eight months even though she was allowed visits twice monthly. On cross-examination, Ragland testified that, although she never saw Harris physically harm the children, she observed Harris interact with her children in a way "that was harmful to their emotional well-being." Ragland testified that Harris was one of the most difficult parents to work with in terms of trying to get her to follow through with recommendations and having appropriate interactions with her children when she did visit with them. Ragland concluded that C.C.H. should be removed at birth because the risk to C.C.H. was too great and risk factors in the home had not been reduced to the point where the child could be safely maintained in the home.

One of Harris's therapists, Chris Farrell, testified that Harris had "gone through" three caseworkers and three therapists by the time he became involved. She failed to show up for her first two appointments, and she did not call. When she appeared for her third appointment, she was angry. Farrell described Harris as self-absorbed with narcissistic and paranoid personality disorder. At one session, after an angry and confrontational exchange, Harris stated, "I'm always angry." Harris made threats against CPS and warned that "they better hope they never end up in a nursing home" where she worked. Harris told Farrell of a woman who called her at the nursing home and made "threats." Harris threatened "back," reminding her that the woman's mother was in Harris's

18

care.  On one occasion when Farrell advised Harris he would be ten minutes late in ending a session with another patient, Harris angrily walked out and slammed the door.  Farrell discussed Harris's lack of cooperation with Kelly Ragland.  Harris told Farrell that Cooks-Harris had made a decision to ignore a court order to undergo paternity testing and that she supported his decision.  Harris failed to conclude the assessment portion of her therapy and dropped out short of the nine sessions cited by the majority.  On the date of her last appointment, Harris failed to show up or call, and she never returned.  Farrell terminated her sessions for noncompliance.

Farrell testified that he was "shocked" at Harris's potential for violence and concerned about her lack of cooperation with therapy.  He concluded she was a very dangerous and violent woman, had made threats against others, and that he could not ensure the safety of her children.  Accordingly, Farrell recommended termination of Harris's parental rights due to the violent nature of her personality:  "She talked about breaking people's legs."  Farrell testified, "I would say that with a woman with this level of anger and rage within her anything is possible," and that Harris would not take responsibility for her actions and was entrenched in her world view.  Farrell explained that Harris's sexual abuse as a child was a significant aspect in her developmental history and that it was also relevant that her mother had abused drugs, Harris grew up in foster care and had an extensive amount of therapy and counseling throughout her life, her sisters were also sexually abused and had abused drugs, and her most recent husband abused drugs.  Farrell felt he was making progress with Harris at the time she discontinued her sessions.

Gayle Michalek, Harris's licensed professional counselor for the period of August to December 2000, testified that she had seen a worrisome pattern of behavior by Harris and was

concerned that Harris had not taken responsibility for the problems that had occurred in the case. Michalek was very concerned about the children returning home and that Harris had regressed in her treatment rather than making progress. Michalek was concerned that Harris was not stable, was not participating adequately in drug and alcohol counseling, and had not complied with Department-requested drug testing. Michalek was also concerned that Harris blamed her eight-year-old daughter for her "sexualized behavior" and that she was "all over" Gonzales and may have initiated some of the sexual activity. Michalek agreed, however, that Harris was not physically abusive nor an uncaring mother.

Sherryl Boyd, the guardian ad litem and court-appointed special advocate for all of the children beginning in 2002, testified that she was appointed to make recommendations to the Court about the welfare of the children and what was in the children's best interest. She described the change in the children and the progress they made when they were removed to their "permanent" foster care family. Boyd testified that their environment was now meeting their needs and that their best interests were being served in their new surroundings. C.C.H.'s siblings had been adopted by the family with which he lived, he was thriving, and he "could not be in a better place." Their home was calm, comfortable, and well-kept. Boyd explained that it is not a fancy home but a loving and wholesome situation. The children are close to each other and love their parents. The children had described to Boyd the fighting, drinking, and drug use that occurred in the Harris household and that it had been M.H.'s primary responsibility to take care of K.D.—to change his diapers, feed him, and clean up. Because Harris often worked at night and slept during the day, there was no one to take

care of K.D. M.H. told Boyd that Harris had a bad temper and often hit him. On cross-examination, Boyd acknowledged that she had never seen the children interact with Harris.

C.C.H.'s foster mother and the mother of C.C.H.'s three siblings testified that in February 2004 C.C.H. turned three years old and in July 2004 had lived with the family for three years. She described how he loved to talk, was happy and full of life, and particularly close to M.H., his oldest brother. He fit seamlessly into the family, and it was in C.C.H.'s interest to stay with his siblings. The foster mother is a school counselor, and the father is a high school teacher. They had expressed a desire to adopt C.C.H.

Harris's employer testified that Harris was a direct caregiver and had provided in-home care to elderly and disabled patients for two-and-one-half years. She described Harris as an excellent and professional employee. She had only seen C.C.H. two times and was not aware that Harris's parental rights to her other three children had been terminated. Taylor Skaar, a domestic violence counselor at a woman's shelter, testified that the only requirement for women to receive services at the shelter is that they have a history of abuse. She testified that Harris had suffered domestic violence from her first husband and that "things" were "rocky" with her current husband, Cooks-Harris. She was not aware of any drug or alcohol use by Harris. A neighbor also testified that he had never seen any evidence of drug use by Harris and was unaware of the protective order.

Harris then testified that her children had been in foster care for several years and that she was not allowed to know where they were because "I guess, my rights aren't as important as their's." She denied using drugs, taking her children to a crack house, or associating with a known sex offender. She complained that the "known" sex offender was convicted a year after her rights

21

to her three older children were terminated. Harris admitted that she had used marijuana when she learned her daughter had been sexually abused by her boyfriend but that she had gone to the park to use it and had not used it around her children. She protested that she did not want to take drug tests because she did not want to pay for them. She acknowledged she had visited Gonzales in jail with her children once or twice because she wanted answers, he had them, and she could not find anyone to keep her children. She testified that CPS "endangered" her marriage to her current husband. She thought she had attended fifty or more Alcoholics Anonymous meetings over the past couple of years. She intended to divorce Cooks-Harris. She had stayed in San Marcos for the sake of her children, and she testified that "[t]hey'll be back." There was only a scant reference by Harris to the best interest of the child.

On cross-examination Harris testified that she had been removed from her mother's custody when she was a young teenager for reasons known to her mother. She stayed in a group home in Montana until she went home. She married Steve Dietrick and, like her mother, suspected that he molested her daughter, C.D. She did not report her suspicions to the police. She testified that Gonzales never lived with her but would stay with her several days each week as long as they dated, which was less than a month. She agreed it was not a wise choice to take the children to visit him in jail. She acknowledged that she had had a number of therapists, probably "less than ten." She also acknowledged that she had heard allegations from Ontiveros and others that a person with whom she was associating was a sex offender, but she was unable to confirm it to her satisfaction. Harris was twenty years old when she had her first child with Dietrick. They had two children together, he had a drug problem and abused her, and he was in prison. He did not provide any

support for her or the children. She acknowledged that she refused to take a urinalysis test without a court order. She filed a grievance against the children's attorney ad litem for speaking to her out of the presence of her own attorney.

Based upon the evidence presented at trial and considering the pertinent factors from *Holley* and section 263.307 of the family code, I would conclude that, even when considered in the light most favorable to Harris, the evidence supports the trial court's presumed finding that appointment of the Department as managing conservator would be in the best interest of C.C.H. He had lived his entire life with the foster family who had adopted his siblings. The foster parents had raised C.C.H., and he was in good health and progressing normally. The record showed continuity of parental affection and care by the foster parents. There was ample testimony that C.C.H. had bonded with his foster family, was close and attached to his siblings, and that the family was a strong family unit. Both the guardian ad litem and the attorney ad litem recommended that Harris's parental rights to C.C.H. be terminated and that the best interest of the child would be served by allowing him to remain with the only family he has known. At the time of the trial, both biological parents had violated a domestic-violence protective order, the biological father whose rights to C.C.H. had been previously terminated was in jail for violation of the protective order, and there was an indication that the conduct would continue. Even if the factfinder had believed Harris that she obtained the protective order out of anger, the record showed that Harris was complicit in ignoring two court orders—the protective order and the court's order that Cooks-Harris undergo a paternity test. There was no evidence of any emotional attachment between the child and his remaining parent.

23

Case workers testified that the Department's permanence plan for C.C.H. was termination and placement for adoption because Harris had demonstrated noncompliance with previous services and C.C.H. had been placed with the foster parents who adopted his brothers and sister. Harris demonstrated recalcitrance in accepting the Department's services and made desultory and meager efforts to act in the interest of her children.

The presumption in favor of a biological parent flows from the belief that the parent will act in the child's best interest, a presumption that has been rebutted and for which I would conclude there is no evidence here. Query how it cannot be in a child's best interest to stay with the only stable, loving family unit—including his brothers and sister—that he has known in his entire life. It is evident from the record that the length of time C.C.H. has been living with his foster family is a significant factor. Courts have recognized a child's need for permanence as "the paramount consideration for the child's present and future physical and emotional needs." *In re M.A.N.M.*, 75 S.W.3d 73, 77 (Tex. App.—San Antonio 2002, no pet.); *see Lehman v. Lycoming County Children's Servs. Agency*, 458 U.S. 502, 513 (1982) (children need stable, long-term relationships with caretakers). But my view does not rest on lapse of time or assigning blame for the delay in these proceedings. We may not allow a determination of the best interest of the child to turn on personal preferences, speculative concepts of proper child rearing, or who "deserves" the child; it is for this reason that we rely on the determinable legal standard provided by the *Holley* and statutory factors, none of which support a finding in favor of the mother based on the record before us.

Our task is made difficult by the Department's perfunctory performance in adducing evidence regarding C.C.H.'s best interest. And Harris's attorney advised the jury in his opening

24

statement that the trial would be contentious and "we're going to have a dog fight." In his closing statement he reiterated that he "promised you that you'd see a dog fight. You saw a dog fight. It's ugly. There ain't a pretty thing about a dog fight. . . . Both dogs usually get hurt." It does not redound to the child's benefit or that of the system for a trial to deteriorate into pitched battle. And we should not protect parental rights at the expense of the best interest of the child, for the best-interest analysis evaluates that of the child, not that of the parent.

Even when all of the evidence is viewed in the light most favorable to the verdict and considered under the pertinent *Holley* and section 263.307 factors, I would conclude that the evidence presented at trial would not enable reasonable and fair-minded people to reach the verdict reached by the jury. I would conclude that the evidence is legally insufficient to support the jury verdict and sufficient to support the trial court's presumed finding that appointment of the Department as managing conservator would be in the best interest of C.C.H. *See Lenz*, 79 S.W.3d at 19.

Because I would affirm the judgment of the trial court, I respectfully dissent.

_____

Jan P. Patterson, Justice

Before Chief Justice Law, Justices Patterson and Puryear

Filed: June 15, 2007

25