

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

NO. 2-08-333-CV

IN THE INTEREST OF A.M.S.
AND L.N.S., CHILDREN

------------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

Appellant R.S. appeals from the trial court's order terminating his parental rights to his daughters A.M.S. and L.N.S. Because we hold that the evidence is factually sufficient to support the jury's endangerment findings and that any error was harmless, we affirm the trial court's judgment terminating Appellant's parental rights to A.M.S. and L.N.S.

------------

[1] *See* Tex. R. App. P. 47.4.

I. Alleged hearsay is harmless, and evidence is factually sufficient.

In his first point, Appellant contends that the trial court erred by admitting statements that L.N.S. made to two witnesses, a CPS investigator and a therapist. Even if the trial court erred by admitting L.N.S.'s statements, which we do not hold, Appellant cannot show harm.

To obtain reversal of a judgment based upon an error in the trial court, the appellant must show that the error occurred and that it probably caused rendition of an improper judgment or probably prevented the appellant from properly presenting the case to this court.[2] We examine the entire record in making this determination of harm.[3]

In his fifth and sixth points, Appellant contends that the evidence is factually insufficient to support the findings that he knowingly placed or allowed the children to remain in conditions or surroundings which endangered their physical or emotional well-being and engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered the physical or emotional well-being of the children. Because we combine our sufficiency review with our analysis of Appellant's point complaining of

---

[2] Tex. R. App. P. 44.1(a); *Romero v. KPH Consolidation, Inc.*, 166 S.W.3d 212, 225 (Tex. 2005).

[3] *Interstate Northborough P'ship v. State*, 66 S.W.3d 213, 220 (Tex. 2001).

2

evidentiary error, we exclude the challenged statements by L.N.S. from our review.[4]

As we have explained in a similar case,

Endangerment means to expose to loss or injury, to jeopardize. The trial court may order termination of the parent-child relationship if it finds by clear and convincing evidence that the parent has knowingly placed or knowingly allowed the child to remain in conditions or surroundings that endanger the physical or emotional well-being of the child. Under subsection (D), it is necessary to examine evidence related to the environment of the child to determine if the environment was the source of endangerment to the child's physical or emotional well-being. Conduct of a parent in the home can create an environment that endangers the physical and emotional well-being of a child.

. . . . Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical or emotional well-being was the direct result of the parent's conduct, including acts, omissions, and failures to act. Termination under subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required.

To support a finding of endangerment, the parent's conduct does not necessarily have to be directed at the child, and the child is not required to suffer injury. The specific danger to the child's well-being may be inferred from parental misconduct alone, and to determine whether termination is necessary, courts may look to parental conduct both before and after the child's birth. . . . A parent's decision to engage in illegal drug use during the pendency of a termination suit, when the parent is at risk of losing a child,

---

[4] *See, e.g., N. Dallas Diagnostic Ctr. v. Dewberry*, 900 S.W.2d 90, 97 (Tex. App.—Dallas 1995, writ denied) (refusing to consider evidence held inadmissible in factual sufficiency review).

supports a finding that the parent engaged in conduct that endangered the child's physical or emotional well-being. Thus, parental and caregiver illegal drug use supports the conclusion that the children's surroundings endanger their physical or emotional well-being. A factfinder may also reasonably infer from a parent's failure to attend scheduled drug screenings that the parent was avoiding testing because the parent was using drugs. As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being.

Because the evidence pertaining to subsections 161.001(1)(D) and (E) is interrelated, we conduct a consolidated review.[5]

The jury heard the following evidence, excluding the challenged statements of L.N.S. A.M.S. tested positive for cocaine and barbiturates at birth. At the hospital, M.F. (Mother) told Carnesha Collins, the CPS investigator, that she had used cocaine throughout the pregnancy. Mother testified that she had used cocaine before and during her pregnancy with A.M.S. and that Appellant had also used cocaine during that period. Mother testified that Appellant had given her the cocaine she used during the pregnancy and that he had used with her. Appellant did not provide any cocaine to Mother after A.M.S. was born.

---

[5] ... *In re J.W.*, No. 02-08-00211-CV, 2009 WL 806865, at *4–5 (Tex. App.—Fort Worth Mar. 26, 2009, no pet.) (mem. op.) (citations omitted); *see also In re J.O.A.*, 283 S.W.3d 336, 345–46 (Tex. 2009).

Collins testified that after she told Appellant about A.M.S. being born with cocaine in her system, he said that he was not sure if he was her father and that he did not care about her.

The foster mother, Mrs. M., testified that A.M.S. has several medical problems:  acid reflux, stomach problems, bowel problems, allergies, and ear infections.  Mrs. M. was told that because of the drugs, A.M.S.'s ear canals did not form properly.

At the hospital after A.M.S.'s birth, Mother also told Collins that she was concerned about four-year-old L.N.S. and afraid for her safety because L.N.S. was in Appellant's care, and he drank alcohol—vodka and grapefruit juice—and did not properly care for her.

Collins went to the Delux Inn off of Airport Freeway in Haltom City, where Mother had said Appellant and L.N.S. were staying.  Collins saw a little girl outside alone, waving at morning traffic.  That little girl was L.N.S.  Collins testified that after she woke Appellant up and told him that L.N.S. was outside alone and advised him that leaving L.N.S. outside alone with no one to adequately care for her was neglectful supervision, he told her that L.N.S. was a big girl and that he was not able to watch her every move.  Appellant denied saying that; he testified that he told Collins that L.N.S. was a big girl and that she sometimes opened the door without him knowing it and that he had caught

her and scolded her for it many times. He also testified that he had told Collins that he thought he had left L.N.S. with the girl next door with adult supervision and that he had fallen asleep. Collins and Appellant's counselor both testified that he had not mentioned that version of the events to them.

Collins saw trash in the hotel room, clothing on the floor, and cigarette butts throughout the entire room, and the room smelled. Collins saw no toys or clothes for L.N.S., and the room contained only one bed. Collins saw no food, except that among the trash on the floor, and no refrigerator. Appellant testified that the room contained a refrigerator, a microwave, and food.

The clothes L.N.S. wore were dirty, and the shoes she wore were too small. She was hungry. Collins could see that L.N.S. had severe tooth decay. Mother testified that a dental appointment had been scheduled for L.N.S. around the time of the removal, and she also testified that L.N.S. had a pediatrician whom she saw regularly and that L.N.S. was current on her shots. Mrs. M. testified that the dentist who saw L.N.S. said that L.N.S. had baby bottle rot and that the dentist had to cap twelve of her baby teeth. Additionally, Mrs. M. testified that L.N.S. was five shots behind when she tried to register L.N.S. for school.

Mother told Collins that she and Appellant were in an "on and off" relationship, that she was very afraid of Appellant because he "assault[ed] her

6

a lot," that she left L.N.S. with Appellant because he would not allow her to keep L.N.S. or to place her with someone other than Appellant, and that in addition to his frequent cocaine use, he drank alcohol daily, used methamphetamine frequently, and used marihuana. Mother testified that she had tried to leave Appellant and take L.N.S. with her several times, but he always stopped her.

At the first scheduled visit of the parents and children after the removal, Mother told Collins that Appellant had threatened to harm Mother and that she had seen him using crack cocaine with about twelve other people a day or two earlier. Collins smelled alcohol on Appellant's breath before the visit and allowed the visit to take place, but she warned Appellant that he could not show up again with alcohol on his breath or appearing to be under the influence.

Appellant did not take a drug test during the course of Collins's three-week investigation but did so later on the advice of counsel. Appellant admitted to Collins that he used marihuana.

Mother, who signed an affidavit voluntarily relinquishing her parental rights, testified that she did not believe that the children would be safe if returned to Appellant because of his excessive drinking and belligerence. She stated that he had been drinking on a daily basis for about thirty or thirty-five

years, starting when he was a teenager. Mother testified that he got "very ugly" when he drank and that he called her names like "cunt," "slut," and "whore dog." She also testified that he could get "real aggressive" when he drank and that he hit her and pushed her, leaving bruises. Mother testified that L.N.S. "observed the yelling, the cursing, [and] the pushing." Later, Mother stated that the physical assaults occurred after the children's removal. Mother testified that she thought it was endangering for L.N.S. to be around when Mother and Appellant had physical altercations and for her to hear the yelling and the language.

Mother testified that Appellant's most recent assault of her happened a couple of weeks before trial; Appellant punched Mother in the leg. He also threatened to kill Mother and the children during that episode. Within the four hours preceding her testimony, Mother testified, Appellant had threatened to "hunt [her] down and kill" her "if he los[t] the kids."

The foster father, Mr. M., also testified. He stated that he had known Appellant for several years, that Appellant has had and still has an alcohol problem, and that Appellant had a severe drug problem in the past. As a result of his alcohol problem, according to Mr. M., Appellant has poor judgment. Mr. M. also testified that domestic violence was part of Mother and Appellant's

8

relationship even before CPS involvement. Mr. M. additionally testified that Mother had told him before that Appellant sometimes got drugs for her.

In his psychological evaluation, which was admitted into evidence, Appellant stated

- that he was once addicted to crack cocaine and that he started using crack in 1993 but stopped on his own in 2003 with no relapses;

- that he used to sell and use amphetamines but has not used since 2000 and got tired of the people he had to deal with;

- that he was hooked on speed;

- that he had used marihuana every day from the time he was fifteen years old until he was thirty years old and that he had quit because he got tired of it (Appellant was forty-five years old at the time of the evaluation), that he had last used marihuana in August 2007, four months before the evaluation, at a party because it was there and his daughter was not;

- that CPS had not yet had him take a drug test;

- that he and a girlfriend used to drink a lot in the 1990s;

- that he had had a beer a few days earlier but before that had last had alcohol in 2001;

- that he does not think that he has alcoholism and that he can quit when he wants to;

- that he does not have a drinking problem anymore;

- that he had never had drug or alcohol treatment or a sponsor and never attended Alcoholics Anonymous (AA) or Narcotics Anonymous (NA);

- that the girlfriend he used crack cocaine with in 1993 and he had had domestic violence issues;

9

- that he had been arrested for five assaults, all alcohol-related: one occurred when he and another man fought in 1985; three occurred when he and a girlfriend fought in 1983; and one occurred because Mother "said he hit her and the police put him in jail";

- that he had had "a bunch" of public intoxications but that the last one was in the 1990s; and

- that when he used to drink, he drank very much and would get aggressive.

In January 2008, soon after his psychological evaluation, Appellant submitted to a hair follicle test and tested positive for cocaine.

James E. Williams, Ph.D., Appellant's counselor, developed a treatment plan for Appellant that focused on anger management and treating Appellant's drug problem and depression. Appellant began in November 2007, attended some sessions in December 2007 and January 2008, and then stopped for three months before returning in late April and attending through mid-June 2008. While Appellant successfully completed a set of twelve sessions of individual counseling, he attended only three sessions of anger management and therefore did not complete it successfully. Williams testified that Appellant needs anger management services "in one of the worst ways" and that "[h]e definitely needs more anger management." Williams stated that his concern at the time of trial was Appellant's allowing his emotions to control him instead of controlling his emotions.

In one individual session, Williams smelled an odor like alcohol on Appellant's breath. Appellant stated that he had had a few beers earlier. At the time Appellant stopped going to counseling, Williams felt that he was in further need of substance abuse treatment. Overall, Williams opined that Appellant continues to need individual and family counseling and anger management.

Cynthia Frazier, from CATS, testified that Appellant had attended the Pine Street residential rehabilitation program but had not completed an intake or taken aftercare classes at CATS. The CPS caseworker confirmed that Appellant had completed the inpatient twenty-eight-day program.

On April 15, 2008, after he completed the inpatient rehabilitation program, Appellant was arrested on outstanding warrants. He and the police officer both testified that he was intoxicated at the time. Additionally, Corporal Joe Portman testified that on June 22, 2008, around 3:45 p.m., he saw Appellant and a female in a motel parking lot on Highway 183 having some sort of confrontation. The female told him that she was trying to leave the motel, and Appellant followed her to the parking lot to try to stop her. She also said that Appellant was intoxicated. When Portman spoke to Appellant, who was aggressive toward the female, the officer observed that Appellant had red eyes and slurred speech and appeared to have a strong odor of an alcoholic beverage

11

on his breath.  Appellant told the officer that he knew he was drunk and did not need to take a sobriety test.  Appellant failed the one-leg stand test, and Portman arrested him for public intoxication.  In the police car later, Appellant was kicking and yelling.

Appellant provided the CPS caseworker with the name of a sponsor only after several months and admitted to her that he did not have regular contact with the sponsor.  The caseworker could never reach the sponsor.

Appellant also provided his caseworker with a month's worth of sign-in sheets to show that he attended NA.  She testified that she would have liked to have seen much more consistent interaction and attendance at NA meetings and that it would have been more beneficial for him to attend AA meetings.  She also testified that he was encouraged to go to CATS for aftercare but that he did not attend.

The caseworker testified that at the time of trial, Appellant continued to need treatment because of his alcohol-involved relapses and arrests after inpatient treatment, and she also testified that he had not followed through with any aftercare, AA, or NA since May 2008.

She also testified that the drug and alcohol abuse were still a concern for her because of his June 2008 arrest, and she stated that she felt "that that's a way that [Appellant] is able to get through day-to-day life, just by drinking

12

and maybe thinking that that will take away a lot of the things that he's faced with."

The caseworker testified that a child would be at "very much risk" if parented by someone who was drinking alcohol. She stated that the parent's judgment would be impaired, the parent's decision-making skills would be poor, and the child could be exposed to alcohol and drink it himself. She also said that it is not safe for a child to be parented by someone who drinks all day and that she did not see any way that such a parent could take care of the child's needs.

The CPS caseworker admitted that Appellant had taken three drug tests since he completed inpatient treatment and that they were all negative. They did not, however, test for alcohol.

The CPS caseworker also testified that she was concerned about Appellant's anger issues and did not believe that he had made any significant progress on being able to control or better manage his anger. The caseworker testified that if Appellant were to get the children back with no one to help him and no other target for his anger, she would be concerned whether he would take his anger out on the children.

Mrs. M. testified that she had known the birth parents for several years. She testified that 99% of the time that she had seen Appellant, he had been

13

drinking. She also stated that she had seen him drinking and driving with L.N.S. in the vehicle. She testified that his drinking is one of her main concerns should the children be returned to the birth parents. She spoke of an occasion about a year or so before the filing of the case at bar when Appellant had arrived at her home, intoxicated and unsteady on his feet, carrying L.N.S., who was filthy and had no coat or shoes even though it was winter. Appellant testified that he had taken L.N.S. from her godmother's house with the support of the police and CPS and that there had been so much chaos there that he just grabbed her and left and went straight to the home of the now foster parents.

Mrs. M. also testified that Appellant told Mother at that time that he had taken L.N.S. to the graveyard and had told the little girl "that that was where her dead mother was." Appellant testified that he had taken her to his mother's grave because L.N.S. had never met her paternal grandmother and that he had never told L.N.S. that Mother was dead.

Appellant admitted that he used drugs after the removal and that he tested positive for drugs in January 2008. He also testified that he did not remember getting anything regarding CATS but that he had gone to meetings at the Bill Gregory Center, that he had an AA sponsor, and that he had been attending NA meetings. He explained that he had not completed anger counseling because of work but stated that he did make an effort.

14

There was also evidence that Appellant did not have stable housing and had not had stable housing for a very long time. Mother said that they lived from place to place. Appellant moved from the Delux Inn after the first visitation. He testified that he lived with his father in Millsap in Parker County at the time of trial but that the home was not a permanent solution and that he also kept a hotel room near his work in Haltom City. The caseworker testified that "[i]t's just not healthy for a child to live in a — from motel to motel, for a child not to be able to grow up with that structure and stability in their lifestyle."

As Collins transported L.N.S. away from the motel during the removal, L.N.S. lowered her voice when discussing Appellant. Collins was concerned after this interaction and sent L.N.S. for a forensic interview. Collins explained at trial that "[i]f [CPS] get[s] to a certain point with a child that severe outcries are made, we send them to a specialist that would be more in-depth." During the forensic interview, Collins testified, L.N.S. made an outcry of sexual abuse.

Mother had indicated to Collins that she was concerned that sexual abuse had occurred because she witnessed L.N.S. inserting Barbie dolls into her vagina.

Mrs. M. testified that she had observed sexual acting out by L.N.S. after the children were placed with her and her husband. Mrs. M. testified that when

15

L.N.S. was first placed with her, and men who were strangers to the child visited, L.N.S. would "automatically go up to these gentlemen when they were sitting, sit on their lap, rub their stomach and chest and face, and the way she was doing it was like a wife would do her husband."

Mrs. M. said that she put L.N.S. in the bath with her Barbie dolls to play with, and when Mrs. M. went back to check on L.N.S.,

> she was inserting the legs [of the dolls] into her vagina. She has played with herself in front of my daughter and my nephew, and she was outside, and we have a rail. She was hunching the rail.
>
> . . . .
>
> [Mrs. M. explained that the phrase meant] [g]oing up and down on the rail with her legs. I caught her doing the same thing to the dogs, and that concerned me, because that wasn't proper behavior for a five-year-old, and I knew something was wrong."

Appellant denied having touched L.N.S. inappropriately and denied ever touching her with an intent to gratify sexual desire. Appellant testified that he had been convicted of assaulting Mother when L.N.S. was young and had served eleven months in jail (he denied committing the assault). He testified that before he began to serve his sentence for assaulting Mother, he placed L.N.S. with a godmother because Mother, who was in and out of the home and had mental illness and drug issues, was not capable of caring for her. A few

16

months after his release, Appellant regained custody of L.N.S., and a month later, Mother began living with him and L.N.S.

Appellant stated that he noticed concerning behaviors of L.N.S. and that Mother told him "stuff that [L.N.S.] was doing when [Mother] was giving her baths" that had not occurred before he had left the child with the godmother. Appellant testified that he reported his suspicions to CPS and the police. He said that CPS made him and Mother take a drug test and that he never heard anything else from them. He also testified that L.N.S.'s concerning behaviors subsided and that he never witnessed them. The CPS caseworker testified that a computerized record would have been created had there been any such calls to CPS and that no record existed.

The CPS caseworker testified that "[t]here [was] no doubt in [her] mind" that L.N.S. had been sexually abused. But the caseworker also testified that no criminal charges had been brought against Appellant related to any alleged sexual abuse. Finally, the caseworker also testified that L.N.S.'s behaviors are a manifestation of the abuse and neglect she has suffered.

Applying the appropriate standard of review[6] but ignoring L.N.S.'s statements, we hold that the evidence is factually sufficient to support the

---

[6] *See In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002).

endangerment findings.  We overrule Appellant's fifth and sixth points.

Because we hold the evidence factually sufficient without considering L.N.S.'s challenged statements, we consequently hold that the error, if any, in their admission was harmless.[7]  We overrule Appellant's first point.

## II.  Any jury charge error is harmless.

In his second point, Appellant contends that the trial court erred by including questions in the jury charge that applied to the children collectively instead of submitting a separate set of questions for each individual child.  In his third point, Appellant contends that the trial court erred by failing to submit the cause upon broad-form questions.  While the State argues that Appellant abandoned or failed to get a ruling on these objections below, we are not prepared to hold that the trial court's ruling at the end of the charge conference—"All right.  I'll deny your objection.  So other than the objection that you just mentioned, everything else is all right?" — pertained only to the last of three objections argued by Appellant instead of to all three objections argued, nor do we hold that Appellant's reply, "We have no other objections, Your Honor," somehow abandoned his already clearly voiced objections.  Based

---

[7] See Tex. R. App. P. 44.1(a); *Romero*, 166 S.W.3d at 225.

18

on our review of the record, we hold that Appellant's objections to the jury charge were properly preserved.

We also hold that the trial court abused its discretion by failing to charge the jury separately regarding the termination of Appellant's parental rights to each child.[8] That is, the jury should have been asked to separately determine (1) whether the parent-child relationship between Appellant and L.N.S. should be terminated and (2) whether the parent-child relationship between Appellant and A.M.S. should be terminated.[9]

On the issue of harm, Appellant argues that because A.M.S. never lived with him and all his time with her was supervised, there is no evidence that he caused impairment or injury to her physical or emotional well-being. However, evidence that Appellant endangered L.N.S. can be used to prove endangerment to A.M.S. and vice versa; further, evidence that he gave Mother cocaine during her pregnancy with A.M.S. is evidence of endangerment.[10] Given the state of

---

[8] ... *See Tex. Dep't of Human Servs. v. E.B.*, 802 S.W.2d 647, 648 (Tex. 1990) (approving separate broad-form question for each child); *In re J.M.M.*, 80 S.W.3d 232, 245, 250 (Tex. App.—Fort Worth 2002, pet. denied) (same), *disapproved of on other grounds by In re J.F.C.*, 96 S.W.3d 256, 267 (Tex. 2002).

[9] ... *See E.B.*, 802 S.W.2d at 648; *J.M.M.*, 80 S.W.3d at 245, 250; *see also* Comm. on Pattern Jury Charges, State Bar of Tex., *Texas Pattern Jury Charges: Family* 185–88 & cmt. (2008).

[10] ... *See J.W.*, 2009 WL 806865, at *4–5.

the entire record, we conclude that this charge error was harmless.[11] We overrule Appellant's second point.

In his third point, Appellant complains that the trial court abused its discretion by not submitting broad-form questions to the jury. Appellant, however, does not allege harm, nor do we see any. We overrule his third point.

In his fourth point, Appellant contends that the trial court erred by including in the jury charge statements that endanger means "to expose to loss or injury; to jeopardize" and that "[i]t is not necessary that the conduct be directed at the child or that the child actually suffers the injury." For the reasons expressed by our sister court in Amarillo,[12] we hold that the trial court did not abuse its discretion by including these definitions and not others in the jury charge. We overrule Appellant's fourth point.

---

[11] *See* Tex. R. App. P. 44.1(a); *Romero*, 166 S.W.3d at 225.

[12] *In re C.J.F.*, 134 S.W.3d 343, 355 (Tex. App.—Amarillo 2003, pet. denied) (upholding substantially same instruction).

III.  Conclusion

Having overruled all of Appellant's points, we affirm the trial court's judgment.

LEE ANN DAUPHINOT
JUSTICE

PANEL:  LIVINGSTON, DAUPHINOT, and GARDNER, JJ.

DELIVERED:  December 10, 2009